**UNITED STATES v. FORNESS et al.**
**(SALAMANCA TRUST CO. et al.,**
Interveners).
No. 113.

Circuit Court of Appeals, Second Circuit.
Jan. 20, 1942.

See, also, D.C., 2 F.R.D. 160.

Norman M. Littell, Asst. Atty. Gen., and Roger P. Marquis, John F. Cotter, and Charles R. Denny, Jr., Attys., Department of Justice, all of Washington, D. C., for United States, plaintiff-appellant.

Charles E. Congdon, of Salamanca, N. Y., for Frank A. Forness and Jessie A. Forness, appellees.

George H. Ansley, of Salamanca, N. Y., for City of Salamanca, First Nat. Bank of Salamanca, and Salamanca Federal Savings & Loan Assn., intervenors-appellees.

G. Sydney Shane, of Salamanca, N. Y., for City of Salamanca, intervenor-appellee.

Richard B. Congdon, of Salamanca, N. Y., for Salamanca Trust Co., intervenor-appellee.

Thomas H. Dowd, of Salamanca, N. Y., for Home Owners' Loan Corporation, intervenor-appellee.

Before AUGUSTUS N. HAND, CLARK, and FRANK, Circuit Judges.

FRANK, Circuit Judge.

This appeal presents the issue of whether the Seneca Nation of Indians, as lessor to the appellees of lands located within the City of Salamanca, New York, may cancel a ninety-nine year lease because of default in the payment of rent. Although there is directly before us only one lease, on which the annual rent is but $4, the question is of greater importance because the Nation, by resolution, has cancelled hundreds of similar leases. The Salamanca Trust Company, which holds a $15,000 mortgage on the property here involved, and three other financial institutions intervened as parties defendant because of their interest as mortgagees of similar plots. The City of Salamanca, which has acquired by tax sales a number of properties under lease from the Seneca Nation, has also intervened. These lands are part of the Allegany Reservation, which, with several others, was set aside by the United States pursuant to treaties, for the Seneca Nation. See The New York Indians, 5 Wall. 761, 18 L. Ed. 708; Seneca Nation v. Tyler, 14 How. Prac., N.Y., 109; Seneca Nation v. Christie, 126 N.Y. 122, 27 N.E. 275; F. S. Cohen, Handbook of Federal Indian Law (1941) 416-424. During the railroad-building era beginning about 1850, railroad companies and settlers leased reservation lands from the Senecas, and these leases were purportedly ratified by the State of New York. When this ratification was invalidated by

the New York Supreme Court,[1] Congress passed the Act of February 19, 1875, 18 Stat. 330, which ratified existing leases and authorized their renewal for terms of twelve years. This was enlarged to ninety-nine years by the Act of September 30, 1890, 26 Stat. 558.

Pursuant to this authority, the lease here involved was made on February 19, 1892 (as a renewal of an earlier lease), for ninety-nine years to Hector G. Forbes, who, in 1919, assigned it to Frank A. Forness and his wife, appellees here. The lease provided for the payment[2] of $4 rent annually in advance, on or before the nineteenth day of February, and stipulated that, if the rent was not paid as provided, the Nation "may re-enter the premises, or resort to any lawful remedy, to remove all persons therefrom." The appellees have erected upon the plot a building costing $63,000 and in 1934 the property was mortgaged to the Salamanca Trust Company for $15,000. Appellees last paid rent on April 11, 1930, and since then they have been in default. Between January 1, 1939, and February 19, 1939, they received notice in the usual form, showing rent due in the amount of $36 (i. e., overdue rent for eight previous years and rent for the ensuing year) plus interest of $8.64 on the overdue rent. On March 4, 1939, the Council of the Seneca Nation passed a resolution cancelling all leases then in arrears. On learning of this resolution, Forness promptly tendered by check to the Indian Agent the amount of $44.64, his obligation as indicated in the notice. The check was deposited by the Agent, with others, in a special account. No payment has been made by the Agent to the Senecas.

Cancellation of these leases, although obviously unexpected by Forness and his neighbors, was not prompted by caprice. There is overwhelming evidence that lessees of these lands were customarily lax about paying their rent. In 1911, for example, 1,095 leases were in default; in 1915, 494; in 1931, 529. An attempt was made in 1911 by the Senecas to retain an attorney to collect the arrears, but the Department of the Interior ruled that the 1901 Act, which allocated the disposition of the rentals, prevented use of the funds for this purpose. In 1915, the Nation adopted a resolution cancelling defaulted leases; the cancellation, however, was not enforced. The present action by the Nation, then, represents the culmination of a long struggle by the Indians to enforce their economic rights. In spite of this undenied provocation, they coupled with their cancellation of the leases an offer[3] to re-rent the affected plots on generous

[1] The opinion is unreported, but its effect is set out in House Misc.Doc. No. 75, 43d Cong., 2d sess. (1875). See also N.Y.Session Laws, 1875, 98th sess., p. 819.

[2] Rent was to be paid to the Treasurer of the Nation. But, as a result of discrepancies in the accounts and other irregularities, the Act of February 28, 1901, 31 Stat. 819, authorized payment to the United States Indian Agent "for and in the name of the said Seneca Nation." The Agent was directed by statute how to distribute the funds, and he was required to account to the Commissioner of Indian Affairs. See Sen.Doc. 145, 55th Cong., 2d sess.; Sen.Rept. 897 and House Rept. 832, 56th Cong., 1st sess.

[3] Details of this offer are included in affidavits submitted on a motion for summary judgment. There seems to have been no formal disposition of this motion, and the case was submitted to a jury for a special finding. After the verdict, the court held for defendants-appellees, saying that there was no need for a jury verdict because only a question of law was presented. After the record on appeal had been printed, with the affidavits included, the District Court entered an order directing that it "be corrected and that mis-statements therein be corrected" by striking out the affidavits. There is no question that the offer was made, and we do not sympathize with appellees' argument that we may not take it under consideration, since we are not treating it as evidence but only in the same way that we might consider an offer, made by a party in his brief or upon oral argument, to have judgment entered in a certain manner, or to waive some legal right, etc. The final judgment was certainly equivalent to a denial of the motion for summary judgment, so that it cannot be said that the affidavits were submitted on a motion which was left hanging in air. Appellees, furthermore, entered into a stipulation including the affidavits in the record. In any case, however, the judge had no authority to strike these affidavits from the record; Federal Rules of Civil Procedure, rule 75(h), 28 U.S.C.A. following section 723c, permits him only to add to the record, or to correct it. Westmoreland Asbestos Co. v. Johns-Manville Corp., D.C., 1 F.R.D. 249; In re Sullivan, 2 F.R.D. 238.

terms (at an annual rental of 2½% of the appraised value of the property, less the value of the improvements).[4] Thus computed, the annual rent on appellees' plot will be $115. Any such lease was to be subjected to all encumbrances which had attached to the cancelled lease.

Appellees argue first that this suit, brought by the United States on behalf of the Seneca Nation to enforce the cancellation, is in effect an action of ejectment, and that the action is barred by Sections 997–999 of the New York Civil Practice Act, which provide that upon a tender of the arrears of rent before judgment, the court shall dismiss the complaint. But state law cannot be invoked to limit the rights in lands granted by the United States to the Indians, because, as the court below recognized, state law does not apply to the Indians except so far as the United States has given its consent. Worcester v. Georgia, 6 Pet. 515, 560, 8 L.Ed. 483; Patterson v. Seneca Nation, 245 N.Y. 433, 157 N.E. 734; Mulkins v. Snow, 232 N.Y. 47, 51, 133 N.E. 123; cf. The New York Indians, 5 Wall. 761, 18 L. Ed. 708. But, it is argued, such consent to the application of state law was granted by Congress, by the Act of February 19, 1875, which authorized this lease and permitted the laying out of villages on the Cattaraugus and Allegany reservations of the Seneca Nation. Section 8 of that Act provided: "That all laws of the State of New York now in force concerning the laying out, altering, discontinuing, and repairing highways and bridges shall be in force within said villages, and may, with the consent of said Seneca Nation in council, extend to, and be in force beyond, said villages in said reservations, or in either of them; and all municipal laws and regulations of said State may extend over and be in force within said villages: Provided, nevertheless, that nothing in this section shall be construed to authorize the taxation of any Indian, or the property of any Indian not a citizen of the United States."

Appellees assert, and correctly, that the words "municipal laws" often are used to refer to the laws of a country dealing with intra-mural matters as distinguished from "international laws" dealing with its extra-mural affairs. Appellees then go on to insist that the symbol "municipal laws" has only that single referent, regardless of context. Such an argument involves the "one-word-one-meaning" fallacy.[5] Similar reasoning would compel the conclusion that a clotheshorse is an animal of the equine species, and make it impossible to speak of drinking a toast. When, as in the statute, the "laws" of a state of the Union are under discussion, there can be no intelligent reference to its international or extra-mural laws, for it has none under our federal Constitution. Appellees' construction would, in effect, read the word "municipal" out of the statute. "Municipal laws" of such a state can have but one referent, i. e., the laws of its municipalities. The meaning is the same as when we speak of the "Municipal Building" of the City of New York. When confronted, as we are here, with a word having two meanings, we should, of course, not select that meaning which gives it the least possible sense in the context in which it is used. In addition to the objection just indicated to appellees' construction, we can find no reason for the specific mention in the statute of state highway and bridge laws if, as appellees contend, all state laws were comprehended in the generic term "municipal laws." We conclude, then, that the statute did not make the "laws"—statutory or decisional—of the State of New York applicable to the reservation. The provisions of the New York Civil Practice Act, therefore, do not bar the result asked by the Indians. And Erie R. Co. v. Tompkins, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188, 114 A.L.R. 1487, is inapplicable.

Appellees argue that if the tender does not prevent cancellation by virtue of the provisions of the Civil Practice Act, it nevertheless has resulted in a waiver of any right to a cancellation of the lease by the Indian Agent, as agent of the Seneca Nation, since he accepted appellees' check for the amount of rent due, deposited it to the credit of the Treasurer of the United States, and failed to return the proceeds to them. They point to the Act of February 28, 1901, which provides that all rents due on leases of lands within this reservation "shall be paid to and be recoverable to the United States Indian Agent for the New York Indian Agency for and in the name of the said Seneca Nation," section 1, as proof of his

[4] This offer was made first to the present lessees; if they refused, it was extended to mortgagees and others with an interest in the premises.

[5] See Hayakawa, Language in Action (1941 ed.) 64–73; cf. Thayer, A Preliminary Treatise on Evidence (1898) 428, 429.

authority thus to bind the Senecas, and they urge that this agency has been recognized and ratified by subsequent conduct. We need not pass on the doubtful proposition that the Agent was the agent of the Senecas, for it is clear that his authority, at most, was only that of a collecting and disbursing agent. As such he had no implied power to make or break leases, nor to waive the Seneca's power to do so.[5a] For the same reason the evidence that the Senecas had ratified his actions is irrelevant; at best, it might show that he was accepted as a collection agent, but it falls far short of indicating that the Senecas have ever accepted him as a proper person to waive their right of cancellation. The findings that they have regarded him as having broader powers were plainly unsupported by any evidence; the most that was shown was a custom to accept overdue payments, and no Seneca Indian was called to show that the Nation knew or ratified even this. Even if the Agent had authority to make—or if the Nation ratified—a waiver, his action was insufficient to constitute one. He caused the money to be deposited in a special account; none of it has been paid to the Nation, and it is, in effect, being held in escrow.[6]

Another ground urged by appellees in support of their theory that there has been a waiver of the right to cancel the lease, needs only brief mention. It is that the notice sent to appellees by the Agent said that rent, though due on February 19, might be paid on or before April 20. In the case before us the appellees paid the overdue rent to the Agent before April 20. We will assume arguendo that the terms of this notice were sufficiently acquiesced in by the Seneca Nation to prevent cancellation unless default in any particular installment continued beyond April 20. But whatever its effect as to rent due for the current year, the notice did not purport to extend the time for payment of rents due for previous years. Here appellees were in default for nine years; they are in no position to rely, as to the rent not paid in any of the previous eight years, on the two-month-grace period with reference to the currently due installment.

It is urged that the lease cannot be cancelled because no proper "demand" was made for the rent. Appellees refer to the ancient common law requisite of a demand, as reported by Coke, viz., that the landlord must ask for "the precise sum due, at a convenient time before sunset upon the day when the rent is due, upon the land, at the most notorious place of it, though there be no person on the land to pay." Prout v. Roby, 15 Wall. 471, 476, 21 L.Ed. 58, citing and relying on Coke on Littleton (Coke's First Institute) 201b; cf. 2 Tiffany, Landlord and Tenant (1912) 1378; Taylor, Landlord and Tenant, §§ 493-4. The details must be strictly observed by the landlord; thus, we are told, "he cannot demand it at the back door of the house but at the fore door." Coke, ibid. The requirement was based on the feudal[7] idea that "the land is the debtor" and that "the rent issueth out of the land" (Coke, ibid; 2 Pollock and Maitland, History of English Law [2d ed. 1905] 130; 7 Holdsworth, History of English Law, 267-268), a notion of dubious applicability to a modern office building.[8] The idea that the purpose of requiring a demand is to render forfeiture more difficult was not articulated until recent times. It would be a rash man who would say that no notions of avoidance of forfeiture were involved even in the feudal doctrine; for, at any period, among lawyers as well as among others, there are fashions in the expressions of

5a To the effect that we are not lightly to hold that the Indians have been estopped by the action of United States officials, see United States v. Sante Fe Pacific R. R. Co., Dec. 8, 1941, 62 S.Ct. 248, 86 L.Ed. —; cf. Cramer v. United States, 261 U.S. 219, 234, 43 S.Ct. 342, 67 L.Ed. 622 and cases there cited.

6 It is worthy of note that the tenders made of rent due on the plots in which the intervenors (who became parties defendant) were interested, were not accepted by the Agent.

7 Of course, "feudalism" is a vague term to describe a congeries of customs and legal relations by no means uniform throughout Europe and never static. Nevertheless, it may be said that "feudalism" had one basic characteristic, traceable through all its variations: it rested on relations to land, the primary factor in a relatively primitive agrarian civilization. See, e.g., Maitland, The Constitutional History of England (1908) 142-145; 1 Stubbs, Constitutional History, sec. 69; Goebel, Cases and Materials on the Development of Legal Institutions (1937) 19-33.

8 Cf. 165 Broadway Building v. City Investing Co., 2 Cir., 120 F.2d 813, 817; Clark, Party Wall Agreements as Real Covenants (1924) 37 Harv.L.Rev. 301.

ideas, and an idea which does not comport with the linguistic fashion may remain unexpressed although actually operative.[9] It is possible, for example, that Coke's insistence on the common law requirement of a demand was a competitive device to attract lessee litigants from the equity courts, which were relieving against forfeiture.[9a] But whether or not Littleton and Coke were thinking at all of relief from forfeiture in connection with the strict demand doctrine, they did not phrase the doctrine in those terms. The transvaluation of that doctrine to make it patently a part of the doctrine of avoidance of forfeiture is a more modern development; today it has, in effect, become merged in the equitable attitude of unfriendliness, generally, to forfeitures, an attitude which we shall discuss presently in its application to the facts of the instant case.

At any rate, the lack of such a demand on the due date was not alleged, nor did the defendants tender this issue at the trial. More important, to require such a demand here would be to insist upon an empty gesture, since the defendants knew that the rent was due.

The rigid doctrine as to demand on the due date is a product of the medieval era. It has been called a period of "strict law," the salient characteristics of which are formalism, inflexibility and indifference to the moral aspects of conduct.[10] Ceremonialism is of its essence: "Estates in land begin in ceremony and end in ceremony," said Coke.[11] Scholars have assigned many reasons for this excessive formalism. Chief among them, it is said, is the distrust of judicial discretion. "Form," wrote Jhering, "is the sworn enemy of caprice, the twin sister of liberty * * *. Fixed forms are the school of discipline and order, and thereby of liberty itself. They are a bulwark against external attack, since they will only break, not bend, and where a people has truly understood the service of freedom, it has also instinctively discovered the value of form and has felt instinctively that, in its forms, it did not possess and hold to something purely external, but to the palladium of liberty."[12] It has been said: "In an epoch of inferior civilization, a rigidly enforced adherence to form serves a twofold purpose. On the one hand, it is an effectual means of curbing the passions of the litigants, of preventing tumultuous conduct and unnecessary harangues, as well as of compelling the parties to look at the facts calmly and make their statements with care. On the other hand, it acts as a check upon the premature tendency to exercise what seems natural justice * * *. A detailed consideration of the facts of the particular case, furthermore, is only compatible with the idea that that determination of the judge, because he is trained and unprejudiced, possesses a higher value than the untrained and prejudiced determination of the party, and that, therefore, in matters affecting his

9 As to the effect of such fashions on scientists, see, e.g., Lewis, The Anatomy of Science, 90–93; as to the effect of fashions on lawyers, see Holmes, Law in Science and Science in Law, Collected Legal Papers (1920) 210, 217; Ideals and Doubts, ibid, 303; Holmes, Book Notices, etc. (ed. by Shriver, 1936) 203, 204; Tourtoulon, Philosophy in The Development of Law (transl. 1922), 288, cf. 192, 196.

9a The common law of this period "is loath to admit new principles, and will not do so unless compelled by such a consideration as the loss of business consequent upon the competition of a rival court." 2 Holdsworth, History of English Law (3d ed. 1923) 591. Such loss of business meant financial loss to the common law judges, whose incomes derived largely from fees paid by litigants in their courts; that that factor affected the attitude of the common law judges was observed by Taney and others. Taylor v. Carryl, 20 How. 583, 614–617, 15 L.Ed. 1028, see other citations in Hume v. Moore-McCormack Lines, 2 Cir., 121 F.2d 336, 344, note 24. There were other operative factors in the hostility to chancery, including professional jealousy on the part of common law lawyers [see authorities cited in Hume v. Moore-McCormack Lines, supra] of a kind not unlike that manifested by some members of the bar today towards the administrative agencies, an attitude against which our Chief Justice and Wigmore have warned. United States v. Morgan, 1939, 307 U.S. 183, 191, 59 S.Ct. 795, 83 L.Ed. 1211; Wigmore, 1 Evidence (3d ed. 1940) 36.

10 See Pound, The Spirit of The Common Law (1921) 140–141; Law and Morals (2d ed. 1926) 27–30; The End of Law as Developed in Legal Rules and Doctrines, 27 Harv.L.Rev. (1914) 195, 204 et seq.

11 Coke on Littleton 214b.

12 Geist des romischen Recht (5th ed.) II, sec. 45, quoted by Pound, 27 Harv.L. Rev. 195, 209, 210.

own interest, the party must bow to the decision of the judge. This idea was opposed, and could not but be opposed, to the then-prevailing self-consciousness of the individual. For, so far as experience, judicial capacity and training were concerned, the persons who were called upon to render judgment offered no better guaranty than the persons whose legal affairs were the subject of adjudication."[13] Writing of the strict procedure of medieval English law, Pollock and Maitland tell us that one of its best qualities "was that in theory it left little or nothing, at least within the sphere of procedure, to the discretion of the justices. They themselves desired that this should be so and took care that it was or seemed to be so.[14] They would be responsible for nothing beyond an application of iron rules * * *. For good or ill they made their choice. The ill is but too easily seen by anyone who glances at the *disorderly mass of crabbed pedantry that Coke poured forth as 'institutes' of English law;* the good may escape us * * *. As time goes on, there is always a larger room for discretion in the law of procedure; but discretionary powers can only safely be entrusted to judges whose impartiality is above suspicion and whose every act is exposed to public and professional criticism."[15] Bowman describes the attitude behind this early formalism thus:[16] "From the despotism of rulers men sought refuge in the despotism of rules. Under the influence of this idea, the rules of law became wholly inelastic and inflexible." In such an era, says Maine, "substantive law has * * * the look of being gradually secreted in the interstices of procedure; and the early lawyer can only see law through the envelope of its technical forms."[17] In much of the medieval period in England, says Holdsworth, "a strict and literal accuracy was required in the pleadings. A mistake in a name, or syllable, or letter was fatal."[18] The same kind of coercion of form, or "form-rigorism," is found in medieval German procedure, where there was required an "observance, painful to the utmost, of a multitude of unimportant externalities * * *. This phenomenon * * * has drawn from Siegel * * * the observation that 'it seems as if the formalities in question had been expressly contrived for the purpose of bringing the litigant to grief, so subtle and insidious was their design, so difficult their execution.'"[19] Winfield remarks that "formalism in procedure is not a disease of early law, but is the life blood of it."[20]

So far at any rate as English medieval law is concerned, this picture of a period of "strict law" has perhaps been overdrawn. Too much should not be made of such historical periodizations. Too often that kind of history-writing, as Aldous Huxley somewhere suggests, results from the ignorance or prejudices of historians.[21] The case for the excessive "strictness" of medieval English law is made out by concentrating attention almost entirely on the activities of the centralized common law courts and, too, in a limited span of

13 Englemann, A History of Continental Civil Procedure (transl. by Millar, 1927) 174–176.

14 The sceptical last qualifying clause is of interest.

15 Pollock and Maitland, History of English Law (2d ed., 1898) II, 563. They also say (p. 561) "The man who has a quarrel with his neighbor" must "choose his weapon. The choice is large; but he must remember that he will not be able to change weapons in the middle of the combat and also that every weapon has its proper use and may be put to none other. If he selects a sword he must observe the rules of sword-play; he must not try to use his cross-bow as a mace."

16 Handbook of Elementary Law (1929) 183.

17 Maine, Early Law and Custom, 389; cf. Holdsworth, 3 History of English Law (3d ed. 1923) 89. Thayer, writing of trial by oath, speaks of its "highly formal character * * * and the perils which attended it * * *. All comes to naught if the principal withdraws his hand from the book while swearing, 'or does not say the words in full as they are charged against him * * *.' We are told (Lea, Superstition and Force, 4th ed. 78) that in the city of Lille, down to the year 1351, the position of every finger was determined by law, and the slightest error lost the suit irrevocably." A Preliminary Treatise on Evidence (1898) 25 note; cf. Maitland, The Constitutional History of England (1908) 115.

18 2 Holdsworth, loc. cit. (3d ed. 1923), 250, 251.

19 Englemann, loc. cit., 177.

20 Chief Sources of English Legal History (1925) 156.

21 Cf. Hume v. Moore-McCormack Lines, 2 Cir., 121 F.2d 336, 346 and note 38.

years. Thanks to the researches of Bolland, Barbour and others, we know that up to the 14th century, and to some extent thereafter, even into the 15th, a kind of equity was administered in those common law courts;[22] when this common law equity decayed, when the equitable principles theretofore recognized at common law evaporated, when common law ossified into a rigid technical system, then equity came to be administered by the Chancery and other non-common law courts.[23]

Nevertheless, if we regard primarily the common law courts, the period when there arose the rigid rule of demand for rent on the due date may, with some justification, be called a period of "strict law." Such rules "devised for purposes now forgotten, survive their occasion in the shape of formal requirements * * *. The rules which make up the traditional element of a legal system often grow up with reference to quite different ends from those we now seek and before the ends we now seek had been recognized * * *. Today, when interests and rights are defined and remedies exist only for securing them within defined limits, there are better means of controlling judicial action than hard and fast formal procedure." [24]

The strict doctrine for which appellees contend derives from the status of landlord and tenant.[25] But here another status or

22 Barbour, Some Aspects of Fifteenth-Century Chancery, 31 Harv.L.Rev. (1918) 834; Bolland, Eyre of Kent (Selden Society, Vols. xxiv, xxvii, xxix; Select Bills in Eyre (Selden Society, Vol. xxx); Allen, Law in the Making (1927) 214ff et seq.; Holdsworth, History of English Law 2 (3d ed. 1923) 334–346; Pollock and Maitland, History of English Law (2d ed. 1898) 189, 190.

23 It was, for instance, the excessive formalism of the common law that made the High Commission, with its greater procedural flexibility, immensely popular in the early 17th century, to the disgust of Coke and the common-law lawyers generally. Usher, The Rise and Fall of the High Commission (1913) 55.

24 Pound, The End of Law as Developed in Legal Rules and Doctrines, supra, 210, 211.

25 We are coming to see that all contracts create status or relational obligations (i.e., that to the consensual act of the parties the courts attach many obligations which usually are not actually in the minds of the parties) and that the status or relational obligations of the feudal contract are merely more obvious because of their peculiar history.

As to the relational aspects of contracts, cf. Markby, Elements of Law, §§ 604–622, 626–628; Langdell, A Brief Survey of Equity Jurisdiction, 1 Harv. L.Rev. (1887) 55, 56 and note 1; M. R. Cohen, The Basis of Contract, 46 Harv. L.Rev. (1933) 553, 554, 555; Gardner, An Inquiry Into The Principles of the Law of Contracts, 46 Harv.L.Rev. (1933) 1, 43; 3 Williston, Contracts (revised ed. 1936) 1768, 1922, 1923, 2312, 2313; Llewellyn, What Price Contract? 40 Yale L.J. (1931) 704; Adler, Business Jurisprudence, 28 Harv.L.Rev. (1914) 135; Adler, Labor, Capital and Business, 29 Harv.L.Rev. (1916) 241; Notes, 28 Harv. L.Rev. (1914) 84, 496, 620; Pound, The Spirit of the Common Law (1921) Chap. I; Hume v. Moore-McCormack Lines, 2 Cir., 121 F.2d 336, 342, 343, and notes 20 and 22.

Note Holmes' remark that a man can "commit a contract" as well as a tort, Collected Legal Papers (1921) 175.

That the feudal status relations were bottomed on contract is a fact which has been much neglected by lawyers, although often recognized by historians and political scientists; see e.g., Goebel, loc. cit., 26, 27; Hume v. Moore-McCormack Lines, 121 F.2d 338 note 2, 343 note 22; Figgis in 3 Cambridge Modern History, 737, 762; Sabine, A History of Political Theory (1937) 216, 221; Catlin, The Story of the Political Philosophers (1939) 151–153, 155; Jacob in The Legacy of the Middle Ages, 505, 529. For criticism of Maine's epigram (in Ancient Law, 3d Am.Ed. 163–165) as to the movement "of progressive societies" from "Status to Contract," see Pound, The Spirit of the Common Law (1921), 28; for an effective vindication of Maine, on the ground that he has been misinterpreted through neglect to note his specific qualifications of his thesis, see 3 Holdsworth, History of English Law (3d ed. 1923) 455.

The fact is that Maine clearly perceived not only the relational aspect of contracts but also—to a far greater extent than Pound—the contractual aspects of feudal relations. Ancient Law, supra, 305–335, 352–354.

Much criticism of Maine, as too much interested in Roman influences on English legal developments, arose in the 19th century when English and American historians were eager to find Teutonic origins for all English institutions. World War I seems to have led to a reaction to that excessive worship of Teutonism. Cf. the comments on Holmes in Radin, Anglo-American Legal History (1936)

relation is also involved—that of the Indians with reference to our other citizens. And that other status, which has a special significance founded in current facts, should operate to abate and modify the rigidities of the landlord-tenant status insofar as they have a basis solely in past history and not in present realties. There was some need, in the medieval period, to protect with marked zealousness, the economic position of the tenant from harsh and oppressive treatment at the hands of the landlord.[25a] There is little need to afford such protection to the tenants of the Indian landlord in the instant case. The reason for the rule being non-existent here, the rule itself should here be ignored. We may recall Holmes' comment: "It is revolting to have no better reason for a rule of law than that so *it was laid down in the time of Henry IV.* It is still more revolting if the grounds upon which it was laid down have vanished long since, and the rule simply persists from blind imitation of the past." [26] Today there is no slavish adherence to such views as those expressed by Thirning some five centuries ago: "*Hornby*—This defendant will be undone and impoverished forever if this action is maintained against him for then twenty suits will be brought against him on the same ground. *Thirning*—What is that to us? *It is better that he be ruined than that the law be changed for him* * * *." Y.B. 2 Henry IV, Pasch f. 18, Pl. 6.[27] We should, rather, act *in the spirit* of Marshall, C. J., who described Lord Mansfield [27a] as "one of the greatest judges who ever sat on any bench," because he did "more than any other *to remove those technical impediments* which grew out of a different state of society, and too long continued to obstruct the course of substantial justice * * *." Livingston v. Jefferson, 1811, 15 Fed.Cas. pages 660, 663, 664, No. 8,411.

Fortunately, we are not trammelled by the ancient doctrine. No legal rules of any particular State are here controlling. Accordingly we are in the same position as federal courts often were during the ninety-six years before Erie R. Co. v. Tompkins, supra, came to bury Swift v. Tyson, 16 Pet. 1, 10 L.Ed. 865, that of making an independent judgment as to the appropriate legal rules. We must look to the "common law" for a determination of this case. But as Holmes has forcefully pointed out, there is no "transcendental body" of common law uniform and unchanging for all jurisdictions having an Anglo-American legal system, nor are courts prohibited "from refusing to follow the English decisions upon a matter where the local conditions are different." [28] It should be noted, also, that where the fed-

431; Wingfield-Stratford, 1 History of British Civilization (1928) 35.

Perhaps now that we and the English are at war with both Germany and Italy, we can attain a more dispassionate attitude towards both German and Roman influences.

[25a] There are conflicting economic factors at work in the development of "lease law" as England moves through the beginnings of a money economy to commercialization of land with "the market" as regulator; customary rents give way to "competition rents," leases are used to circumvent the rules against usury, businessmen invest in leases, the lease is more and more assimilated to an ordinary contract, etc. See, e.g., Maine, Village Communities (3d ed. 1876) Lecture VI; Maitland, The Growth of An English Manor, 9 Eng.Hist.Rev. (1894) 417, reprinted in Beard, Introduction to the English Historians (1906) 158, 167, 168; Radin, Anglo-American Legal History (1936) 381; Holdsworth, loc. cit. vol. 3, 129; vol. 7, 328; vol. 8, 105, 106.

[26] Holmes, The Path of the Law, in Collected Legal Papers (1920) 187.

[27] Whether that was a typical sentiment in its day may be doubted. See Winfield, The Chief Sources of English Legal History (1925) 154 note 2, to the effect that Thirning's was an "exaggerated assertion"; cf. Allen, Law in The Making (1927) 132–134; Radin, Anglo-American Legal History (1936) 351ff.

[27a] For a recent excellent evaluation of Mansfield, see Shientag, Lord Mansfield Revisited—a Modern Assessment (1941) 10 Fordham L.Rev. 345 and note 384.

[28] Dissenting opinion in Black & White Taxicab Co. v. Brown & Yellow Taxicab Co., 1928, 276 U.S. 518, 533, 48 S.Ct. 404, 409, 72 L.Ed. 681, 57 A.L.R. 426. That dissent, having been quoted with approval in Erie R. Co. v. Tompkins, supra, may now be taken as voicing correct doctrine. A similar attitude was expressed by Holmes in Southern Pac. Co. v. Jensen, 1917, 244 U.S. 202, 222, 37 S.Ct. 524, 531, 61 L.Ed. 1086, L.R.A. 1917E, 900: "The common law is not a brooding omnipresence in the sky, but the articulate voice of some sovereign or quasi-sovereign that can be identified * * *."

Maine, writing in 1861, had used the same metaphor when he referred to the

eral courts are applying "federal law"—as, for instance, in the application of federal statutes—the Supreme Court has held that they are not, "in the face of greatly changed conditions * * * still chained to the ancient formulæ * * *."[29] It follows that we are here at liberty to apply legal rules as to landlord and tenant which comport with the Congressional intent concerning the Senecas.

We cannot believe that Congress intended that, in our times, the rights of American Indians as landlords should be determined by the early 17th century views of Coke—an antique dealer in obsolescent medieval ideas[30]—commenting enthusiastically on the 15th century writings of Littleton, a medieval lawyer.[31] Indeed if we were to emulate Coke, we would not take too seriously any precedent which we found un-

---

doctrine, which he criticized, "that somewhere in nubibus, or in gremio magistratuum, there existed a complete, coherent, symmetrical body of English law, of an amplitude sufficient to furnish principles which would apply to any conceivable combination of circumstances." Ancient Law (3d Am.Ed.), 31. Still earlier, in the latter part of the 17th century, the Marquis of Halifax wrote: "Now I would fain know whether the Common Law is capable of being defined, and whether it doth not hover in the clouds * * * and bolteth out like lightning to be made use of for some particular occasion?" Political Thoughts and Reflections, Foxcroft II, 496, quoted in Holdsworth, 6 History of English Law, 287 note 7. Cf. Corbin, The Laws of The Several States (1941) 50 Yale L.J. 762, 765.

29 Funk v. United States, 290 U.S. 371, 379, 54 S.Ct. 212, 214, 78 L.Ed. 369, 93 A.L.R. 1136; cf. Ex Parte Peterson, 253 U.S. 300, 309, 310, 40 S.Ct. 543, 64 L.Ed. 919.

30 We are, of course, not to be understood as indulging in a denigration of everything "medieval" or "feudal." The ideals of the middle ages were noble in many respects. And, making due allowance for the meager economic base, some of the practices of that era had aspects from which we "moderns" may still learn much. See comments in Hume v. Moore-McCormack Lines, 2 Cir., 121 F.2d 336, 338 note 3, 345 note 33. Cf. Maitland's criticism of historians who speak of "feudalism as though it were a disease"; Domesday Book and Beyond, 121. As to the current value of medieval philosophy, see, e.g., 2 McKeon, Selections From Medieval Philosophers, General Introduction, ix–xviii.

31 "Coke's books," said Maitland, "are the great dividing line, and we are hardly out of the Middle Age till he has dogmatized its results." Coke "restated the medieval common law." 5 Holdsworth, History of English Law, 489–491.

Littleton's book, published in 1481, "summed up and passed on to future generations the land law as developed by the common law lawyers of the Middle Ages, before it was remodelled by the growth of the new equitable principles administered in the Chancery * * *. Many of the complications of this land law, as expounded by Littleton, arose partly from the enthusiasm of the legal profession for the technicalities of a vicious system of procedure * * *. Many of the old doctrines became gradually dormant, but it was still possible to revive them; and so, although with new doctrines, new complexities were introduced, the old doctrines still influenced the law. But it was impossible to understand the real meaning of these old doctrines without a knowledge of the old procedural rules from which they originated. When that origin was forgotten, fictitious or a priori reasons were invented; and ignorance of history became the real foundation for much abstract and arbitrary legal doctrine * * *. Such doctrine was regarded with *the reverence which is always at the disposal of the incomprehensible:* and the law became infested with that mysticism which, as Mill has pointed out, was not dispelled till Bentham arose. This process was only just beginning in the days of Littleton." 2 Holdsworth, loc. cit. (3d ed. 1923), 574, 575, 588, 589. But it was at its height when Coke, in 1628, republished with his own elaborate commentaries (and as his own First Institute) Littleton's book, which Coke described "as the ornament of the Common Law, and the most perfect and absolute work that ever was written in humane science." With such devotion to a 15th century book, Coke, at times, treats as living 17th century law, rules which were then well on the way to being discarded by his contemporaries. "It cannot be denied that the victory of Coke's views has had unfortunate effects both upon the form and certain parts of the substance of English law," says Holdsworth, adding that "the very conservative character of his writings has led to the *retention * * * of rules and doctrines which were already almost obsolete in his day.*" 5 Holdsworth, loc. cit., 491; see also 474 note 4. Coke "had all the defects of the historical lawyer in an exaggerated form. *He is ready with an explanation, and sometimes with a de-*

desirable. For although Coke relished antiquities, he was "no case lawyer, if by that we mean one who regarded a past decision as quite conclusive. On the contrary, he was more than ready to argue that a case decided in past time was wrong, and he very definitely believed in selecting from the number of past decisions those with which he agreed." [32] (In truth, eminent legal historians have said that Coke had no hesitation in unscrupulously distorting or even fabricating precedents to suit his purposes.[33])

Moreover, in deviating from Coke, we are not without precedent. As early as 1730, Parliament, recognizing that the requirement of demand for rent on the due date was unduly ritualistic, abolished it when the lessee is in default for more than six months. Statute of 4 Geo. II, c. 28. A number of states have enacted similar or more liberal statutes.[33a] Much might be said for the position—accepted in one State—that the English statute, adopted prior to Independence, is part of the "common law." [34] Campbell v. Shipley, 1874, 41 Md. 81. See 2 Tiffany, Landlord and Tenant, 1381–82. We do not say that there is a federal "common law" which includes the 1731 English statute as such. It is enough that, in construing the federal statute relating to the Senecas, Coke's learning on the requirement of a demand need not be regarded as the last word, since it has been recognized in England and America as long outmoded. The unprotected position of the Indians [35] clearly suggests that the Congressional purpose was that Indians' leases should be governed by a rule of "property law" at least as favorable to them as that which is followed in our more progressive states, particularly when there is involved a requirement which, in the case at bar, would have been without any useful function.[35a]

There is this further fact: According to Coke, demand must ordinarily be made on the land, "because the land is the debtor, and that is the place of demand appointed by law," but the rule was otherwise if some other place was designated at which the rent was to be paid. Coke on Littleton, 201b, 202a. Van Rensselaer v. Jewett, 2 N.Y.

---

*fense, of all the anomalies which disfigured the law. He almost justifies trial by battle; and he regrets the decay of the cumbersome apparatus of the real actions. He is ready also with detailed explanations of all the technical rubbish with which the premature hardening of the procedural rules into a definite system had burdened it; and between explanation and justification it never occurred to him that there could be any distinction."* Ibid, 479. "The law of contract and the law of personal property were becoming independent branches of the law—as important as the land law itself. But it was hardly to be expected that a man like Coke, who was *saturated with medieval law, whose outlook both as judge and politician had ever been directed to the past,* should appreciate these new developments." Ibid, 468.

Cf. Maitland, The Constitutional History of England (1908) 142; Goebel, loc. cit., 723; Winfield, The Chief Sources of English Legal History (1925) 312.

32 Radin, Anglo-American Legal History (1936) 853.

33 See e. g., Wigmore, Evidence (3d ed. 1940) Section 2036, note 3, Section 2250 note 9; cf. Thayer, A Preliminary Treatise on Evidence (1898) 185, 186, note 4; Radin, supra, 285; Usher, Rise and Fall of the High Commission (1913) 191, 192.

33a These ordinarily omit the provision, included in the statute of 4 Geo. II, c. 28, that no sufficient distraint can be found on the premises.

34 As to the "reception" of the English common law in the several states, see, e. g., Goebel, loc. cit., 405–422; 721–725; cf. Marshall, C. J., in Livingston v. Jefferson, 1811, 15 Fed.Cas. pages 660, 663, 664, 665, No. 8,411.

35 The Supreme Court, in United States v. Santa Fe Pac. R. R. Co., Dec. 8, 1941, 62 S.Ct. 248, 255, 86 L.Ed. — has recently referred to "the avowed solicitude of the Federal Government for the welfare of its Indian wards." It went on to say: "As stated in Choate v. Trapp, 224 U.S. 665, 675, 32 S.Ct. 565, 569, 56 L.Ed. 941, the rule of construction * * * for over a century has been that 'doubtful expressions * * * are to be resolved in favor *of a weak and defenseless people, who are wards of the nation, and dependent wholly upon its protection and good faith.*' "

35a As the rent is so small that the expense of a suit for its recovery will exceed the amount collected, making such a suit impractical, we might perhaps be justified in regarding this lease as equivalent to one in which a demand is expressly waived. Under such a lease, the strict rule as to demand on the due date was held to be inapplicable. Doe v. Masters, 2 B. & C. 490, 107 Eng.Rep. 466, citing Dormer's Case, 5 Coke 40a; Goodright v. Cator, 2 Dougl. 477, 99 Eng.Rep. 304, 310.

141. We think it a fair inference from the terms of the Act of February 28, 1901, 31 Stat. 819, that the rent was payable at the office of the Indian Agent. Appellees do not contend that he was not there to receive it, and we assume that they do not intend to urge that the Indian Agent should have stood on the steps of his office and mouthed an oral demand to the bystanders, as was done in Van Rensselaer v. Jewett, supra. Cf. Singer v. Sheriff, 28 Pa.Super. 305.

We turn, then, to the argument based upon the tender made by appellees, which they assert will stimulate a court of equity to overturn the cancellation of the lease. It is well-established that, as a general rule, equity will relieve against a forfeiture cause by non-payment of rent on the due date. Story, Equity Jurisprudence (14 ed.) § 1727ff; Pomeroy, Equity Jurisprudence (4 ed. § 453).[36] But it is equally well-established that that rule, being equitable, is not inflexible, and that such relief will be granted only to an innocent suitor, i.e., one with clean hands.[36a] This requirement bars relief to one who has been negligent—or at least grossly so—or who has inexcusably or deliberately gone into default. Pomeroy § 452; Sheets v. Selden, 7 Wall. 416, 425, 19 L.Ed. 166. We think the defendants fall in the category of persons whose own conduct makes relief inequitable. See Davirris v. Boston Safe Deposit Co., 235 Mass. 76, 126 N.E. 382, 16 A.L.R. 429; Crawford v. Texas Improvement Co., Tex. Civ.App., 196 S.W. 195; Blue Ridge Metal Mfg. Co. v. Proctor, 327 Pa. 424, 194 A. 559. There is not here a mere technical delay caused by an oversight; defendants, on the other hand, cavalierly ignored their modest obligation for eight years. Rents were allowed to fall into arrears, not only on this property, but on four others owned by one of the appellees. Perhaps because they knew the amounts were so small that suit would not be brought by the Indians, perhaps out of sheer defiance of a historically maltreated people, perhaps out of complacency born of past experience that the Indians were patient—the defendants chose of their own accord to let many years slip by without payment.

Circumstances like these cannot be excused by the lame apology that others were doing likewise, and that the Senecas were known to be long-suffering. Even if such an excuse were not tantamount to an astonishing claim of a vested right in wrongdoing, preventing any correction of an evil condition, it would still fall far short of proving laches on the part of the Indians. It would be both impractical and unfair to require the Indians to bring suit each year for the paltry sum owed on this plot, a suit costing more than the amount which it would yield, and it would be equally impractical and unfair to hold that they must expend part of the rent for badgering defendants and their neighbors into prompt payment. To hold that the Senecas cannot cancel this lease because they have treated defendants and others generously in the past would, in these circumstances, be a miscarriage of justice. We do not say that complacency by a landlord may never amount to a waiver of the right to strict enforcement of his lease, but under the circumstances disclosed here, where there has been shown a flagrant abuse of a landlord, helpless because of the small amounts involved, if not for other reasons as well, the conduct does not amount to a waiver. The very difficulty of enforcing the payment of rent due on this and similar leases creates some possible doubt as to the application of the doctrine against forfeiture, upon which appellees build their case. The common-sense behind the granting of relief is that the primary object of the parties is the payment of rent, for which the right to re-entry is only security; on this reasoning, landlords are denied the use of their power of re-entry where the rent payment, to which that power is only incidental, is made. We may question, though we need not decide, whether the doctrine should be applied when experience indicates that lessees are so recalcitrant that only a vigorous enforcement by the landlord of all its rights will be effective.

36 For the classic statement of the doctrine, see Lord Eldon's opinion in Hill v. Barclay, 18 Ves. 56, 34 Engl.Rep. 238; cf. 7 Holdsworth, History of English Law, 292; II Ibid. 589; 13 Halsbury's Laws of England 192; 20 Ibid. 264. For the English statutes, see 2 Chitty's Statutes (6th Ed.) 805, 847; 7 Ibid. 485.

36a As the defendants are, as to the tender, asking equitable relief and not merely seeking to enforce a common law right in a court of equity, cases such as Manufacturers' Finance Co. v. McKey, 294 U.S. 442, 55 S.Ct. 444, 79 L.Ed. 982, are not in point.

When a defendant asserts an equitable defense he is, negatively, seeking equitable relief. Then—at least to some, although perhaps to a lesser extent—factors are pertinent which would be apposite if he were a plaintiff asking the affirmative aid of equity. If the defendants here were, as plaintiffs, asking specific performance of a contract to execute the lease now before us, it is doubtful whether they would succeed. The consideration—$4.00 a year—comes close to being unconscionably small. True, an unconscionably small consideration may not always be alone sufficient to bar a negative or even an affirmative equitable remedy. But here the consideration consists of annual future installments of rent so small in amount that, as we have noted, the expense of suits for their recovery makes their collection impractical; the consequence is that, for practical purposes, the lease is the equivalent of one which explicitly denies the landlord any right to sue for the rent, leaving him the cancellation of the lease as his sole remedy for nonpayment. That the tenant, under such a lease, can unfairly take advantage of the landlord is amply demonstrated in this case. A lease of that kind may shock even a calloused conscience. It would seem that the defendants' assignor, as tenants, in making such a lease with the Indians, as landlord, for a term of 99 years, drove a hard bargain. In those circumstances, the conscience of the chancellor, which must be stimulated if the tenants are to receive even negative equitable relief, will not be easily aroused on their behalf. And it should not be stimulated in this case, all the facts considered.

There is another reason why such relief is not proper here. Defendants, at least, are entitled only to relief against a "forfeiture." The Indians, as we have said, offer to enter into a new lease upon most equitable terms, and, on oral argument, the United States, on their behalf, expressed complete willingness to have those terms embodied in our decree. No doubt the loss of an advantageous bargain can be a forfeiture, and if the defendants here have to pay $115 annually instead of $4, they will suffer a financial loss which will be diminished neither in amount nor in intensity by our refusal to call it a "forfeiture." But equity will not relieve against any and all losses; we must first find some shocking or clearly unfair feature. Suppose, in the case at bar, the parties by agreement had provided that on a default in the payment of the $4 rent, the landlord could not retake possession, but would be privileged to charge thereafter rent computed as the appellants here have offered to compute it. Would we have them relieved against the provision for increased rent on the ground that it worked a forfeiture? We think not, and we think that this answer is decisive of the argument made by appellees. Cf. Emery Bird Thayer Co. v. Williams, 8 Cir., 98 F.2d 166.

Our refusal to exercise our equity powers in these circumstances is reinforced by an unhappy realization that the dealings of certain of our citizens with the Indians have often been far from praiseworthy.[37] The federal courts usually, unless precluded by complete want of power,[38] have done what they could to prevent unfairness to Indians. Cf. Worcester v. Georgia, 1832, 6 Pet. 515, 8 L.Ed. 483.

Under seriously adverse conditions, guardianship of the American Indians by the federal government has been necessary; they have accordingly been considered the nation's "wards."[39] Of recent years (extending over three presidencies) a program has been developed by the federal government to restore the Indians as soon as possible to a position of self-reliance. See F. S. Cohen, Handbook of Federal Indian Law (1941) v, 83ff. That they are inherently able, in proper circumstances, to attain such a position is apparent from the character of the Indian civilization on this continent prior to the advent of the white man and from the nature of the civilization of those Latin-American countries—now cooperating with us in a war against facism—where a large part of the population is Indian. But certainly in 1892, when the lease in suit was made, the Seneca Indians were still subject to exploitation.

It is of interest that, after the decision in Worcester v. Georgia was rendered, Mr.

---

37 See, for a general summary of our Indian policy, MacLeod, Native Policy—North America, 11 Enc.Soc.Sc. 260.

38 Cherokee Nation v. Georgia, 1831, 5 Pet. 1, 8 L.Ed. 25; Ex parte Green, 2 Cir., Nov. 24, 1941, 123 F.2d 862.

39 United States v. Santa Fe Pac. R. R. Co., supra; Choate v. Trapp, supra; La Motte v. United States, 254 U.S. 570, 41 S.Ct. 204, 65 L.Ed. 410 and cases cited.

Justice Story wrote to his wife, on March 4, 1832, "Thanks be to God, the Court can wash their hands of the iniquity of oppressing the Indians and disregarding their rights." [40]

There were included in the record proposed findings and objections thereto. This was improper. Federal Rules of Civil Procedure, rules 52(a), 75(e), 28 U.S.C.A. following section 723c. Although we cannot condone this practice, it happens that in this case the inclusion of this material in the record seems to show that the appellant's objections were made not to the findings listed in the record as defendants' requests to find, but rather to other proposed findings with which the findings of the district court are apparently identical. We have recently asked for "brief and pertinent findings of contested matters * * * rather than the delayed, argumentative, overdetailed documents prepared by winning counsel." Matton Oil Transfer Corp. v. Tug Dynamic, 2 Cir., Dec. 1, 1941, 123 F.2d 999, 1001. Otherwise, we lose the benefit of the judge's own consideration. In the instant case, a comparison of the findings with the opinion seems to show that the findings proposed by the defendants were mechanically adopted, with the consequence that some of the findings made by the district court are not supported by the evidence and not substantially in accord with the opinion. Such a result can usually be avoided by following what we believe is the better practice of filing findings with the opinion, when the evidence is still fresh in the mind of the trial judge, and permitting the parties to file objections under Federal Rules of Civil Procedure, rule 52(b). See Matton Oil Transfer Corp. v. Tug "Dynamic," supra.

We stress this matter because of the grave importance of fact-finding. The correct finding, as near as may be, of the facts of a law suit is fully as important as the application of the correct legal rules to the facts as found. An impeccably "right" legal rule applied to the "wrong" facts yields a decision which is as faulty as one which results from the application of the "wrong" legal rule to the "right" facts. The latter type of error, indeed, can be corrected on appeal. But the former is not subject to such correction unless the appellant overcomes the heavy burden of showing that the findings of fact are "clearly erroneous." Chief Justice Hughes once remarked, "An unscrupulous administrator might be tempted to say 'Let me find the facts for the people of my country, and I care little who lays down the general principles.'" [41] That comment should be extended to include facts found without due care as well as unscrupulous fact-finding; for such lack of due care is less likely to reveal itself than lack of scruples, which, we trust, seldom exists. And Chief Justice Hughes' comment is just as applicable to the careless fact-finding of a judge as to that of an administrative officer. The judiciary properly holds administrative officers to high standards in the discharge of the fact-finding function. The judiciary should at least measure up to the same standards.

It is sometimes said that the requirement that the trial judge file findings of fact is for the convenience of the upper courts. While it does serve that end, it has a far more important purpose—that of evoking care on the part of the trial judge in ascertaining the facts.[42] For, as every judge knows, to set down in precise words the facts as he finds them is the best way to avoid carelessness in the discharge of that duty: Often a strong impression that, on the basis of the evidence, the facts are thus-and-so gives way when it comes to expressing that impression on paper. The trial court is the most important agency of the judicial branch of the government [43]

[40] I Warren, The Supreme Court in United States History (2d ed. 1926) 756.

[41] Address before Federal Bar Association in 1931, quoted in N. Y. Times, February 13, 1931, page 18. See Landis, The Administrative Process (1938) 135, 136. Cf. Bell, Let Me Find the Facts, 26 A.B.A.J. 552 (1940).

[42] It is to be noted that Rule 52(b) is not a rule relating to appellate practice, i. e., it does not limit the obligation to file findings to those cases in which an appeal is to be taken.

[43] Cf. "The trial judge is the most important officer of government * * *. The trial court is absorbed in law administration at first hand. The appellate court is so far removed from the real controversy that it more and more becomes concerned primarily with fashioning harmonious rules and doctrines for use by trial courts." Leon Green, The Duty Problem in Negligence Cases (1928) 28 Col.L.Rev. 1014, 1037.

precisely because on it rests the responsibility of ascertaining the facts.[44] When a federal trial judge sits without a jury, that responsibility is his. And it is not a light responsibility since, unless his findings are "clearly erroneous," no upper court may disturb them. To ascertain the facts is not a mechanical act. It is a difficult art, not a science. It involves skill and judgment. As fact-finding is a human undertaking, it can, of course, never be perfect and infallible. For that very reason every effort should be made to render it as adequate as it humanly can be.[45]

The judgment dismissing the complaint is reversed, and the case is remanded for entry of a judgment for the plaintiff, on condition that the offer of the new lease, as set forth in plaintiff's affidavits, be kept open for sixty days following the entry of the judgment.

---

[44] And because, too, the majority of decisions are not appealed.

[45] It is appropriate to note that, unlike federal administrative agencies charged with fact-finding, the federal district judges are not adequately supplied with law clerks in the discharge of their duties. Were they so staffed, they would find more time to expend on the important task of fact-finding.