ARTHUR I. GRAYSON *v.* ELYN K. GRAYSON
(2614)

DUPONT, C.P.J., HULL and BORDEN, Js.

Argued February 5—decision released June 18, 1985

*Wesley W. Horton,* with whom was *Susan M. Cormier,* for the appellant (defendant).

*Lawrence P. Weisman,* with whom, on the brief, was *Ellen B. Lubell,* for the appellee (plaintiff).

HULL, J. The defendant wife appeals from the judgment of the trial court denying her motion to open a judgment of dissolution on the ground of fraud in the plaintiff husband's affidavit. The original judgment was based on the oral stipulation of the parties, made in open court. The defendant's major claims are three: (1) that the defendant was denied a fair hearing because the court's twenty-three paragraph factual statement was taken verbatim from the plaintiff's proposed findings of fact submitted to the trial court after the hearing on the motion to open; (2) that the court's findings of fact were unsupported by the evidence and thereby were clearly erroneous; and (3) that the court erred in its conclusion that the defendant did not meet the requirements for opening a judgment based on fraud. Boiled down, the latter two issues merge into the single issue of whether the court's judgment was clearly erroneous. Practice Book § 3060D.[1] We conclude that the defendant was not denied a fair hearing and that the judgment was not clearly erroneous. We, therefore, find no error.

There is no dispute about the procedural background of this case. On May 28, 1981, the third day of the dissolution trial, the court, *Hon. William L. Tierney, Jr.,* state trial referee, dissolved the thirty year marriage of the parties incorporating into the judgment an oral settlement, stipulated to by the parties, regarding the division of property and nonmodifiable alimony. The plaintiff, fifty-six years old at the time, was a gradu-

---

[1] The defendant also briefed the issue of whether the trial court utilized a different standard in weighing her testimony as opposed to that of the plaintiff. We conclude that this claim is without merit.

ate of the Wharton School of Finance and Columbia Law School who had been successfully involved for many years in business for himself. The defendant, fifty-three years old, was a graduate of Simmons College and is the sole shareholder and employee of Minuteman Realty Company. The parties have three grown children.

The plaintiff's chief vehicle for his various business interests was Grayson Associates, Inc., a Connecticut corporation of which he was the sole shareholder. With immaterial exceptions, all of his various forms of income and investment funneled through this conduit, which he controlled totally. He was a general partner in three limited partnerships operating three bowling centers, Nutmeg Bowl, Colonial Lanes, and Laurel Lanes, the profits from which were paid to Grayson Associates, Inc. He was also the sole shareholder in three corporations operating lounges associated with these bowling centers, the profits from which were turned over to the bowling centers. Grayson Associates, Inc., provided the plaintiff with a salary, a profit sharing plan which, among other investments, was also a limited partner in the three bowling centers, and a deferred benefit pension plan which was also a limited partner in the three bowling centers.

The stipulated judgment ordered the plaintiff to pay to the defendant lump sum alimony of $150,000, payable in installments of $50,000 by June 28, 1981, $50,000 by August 28, 1981, both of which have been paid, and $50,000 by February 28, 1982, which the plaintiff has paid into escrow pending the outcome of this appeal, together with nonmodifiable periodic alimony of $12,000 per year. The plaintiff was also ordered to pay $15,000 as part of the defendant's attorney's fees and to maintain a $50,000 life insurance policy on his life owned by the defendant and payable to her. The defendant was ordered to transfer her one

half interest in a business building at 636 Kings Highway, Fairfield, to the plaintiff, the equity in which he claimed was $50,000. The defendant was required to relinquish her claim in the amount of $27,000 to a certificate of deposit managed by the plaintiff. The defendant was awarded full ownership of Daniel Oil, which the plaintiff's affidavit claimed produced an income of $18,000 per year. Works of art valued by the plaintiff at $64,700 were ordered divided between the parties. Otherwise, each was to retain substantial other assets shown on their affidavits. The principal asset shown by the plaintiff's affidavit is the valuation, after taxes due on liquidation, of his pension plan in Grayson Associates, Inc., at $340,152 and the principal asset shown by the defendant's affidavit is the former family residence at 15 Berkeley Road, Westport, in which the claimed equity was $167,000.

On September 23, 1981, the defendant moved to open the judgment rendered on May 28, 1981 on the ground that the stipulated agreement was based upon a fraudulent affidavit of May 26, 1981, submitted by the plaintiff to the court and to the defendant.[2] Extensive discovery was conducted by the defendant prior to the

[2] Pertinent parts of the plaintiff's affidavit of May 26, 1981, provide:
"I. INCOME

"The plaintiff shall set forth to the best of his ability his projected income for 1981:

"1. Grayson Associates, Inc.

| | |
|---|---|
| 1980 gross income | $82,000.00 |
| Less: tax and social security (approximately) | 24,000.00 |
| Net per annum | $58,000.00" |

The plaintiff noted that "[t]he amount of gross income from Grayson Associates, Inc., in 1981 may be slightly less by reason of the bowling business trends."

"4. Georgetown at Enfield Associates      $-0-

"NOTE: No income in the future will be received. Depicted under assets

dissolution and the evidentiary hearing on this matter. Depositions were taken, and the defendant used the services of an accountant, an actuary and a bowling expert. Her accountant examined records at the office of the plaintiff. The trial court, *Jacobson, J.*, held hearings on the motion to open on June 1, June 2, July 27, and August 17, 1983.

The plaintiff filed a memorandum on September 1, 1983, including a requested finding of facts of twenty-three numbered paragraphs. The defendant filed no such request and did not object to the plaintiff's filing of such a request. On September 19, 1983, the court filed a memorandum of decision which adopted the plaintiff's requested findings of fact verbatim except that in paragraph nineteen there is an apparent typographical error in that the reference to the plaintiff's 1981 income should refer to his 1982 income.[3]

are distributions to which the plaintiff will be entitled.

"II. ASSETS:

"1. General partnership interest of .17% Georgetown at
    Enfield Associates to be received in the future   $   959.76
    8% limited partnership interest in Georgetown at
    Enfield Associates—equity to be received in the
    future        $46,080.00"

The plaintiff also noted that these interests in Georgetown at Enfield were "[a]fter contemplated income tax repercussions to be caused by reason of distribution." He further noted that the "[f]unds are presently undistributed and invested in certificates of deposit and earning interest thereby. As a result, said sums will be enhanced to some degree by accumulation of interest."

[3] For a proper understanding of the issues in this case it is necessary to reproduce the court's findings in toto.

"The following facts are found:

"(1) The marriage of the parties was dissolved by judgment of this court (Tierney, J.) on May 28, 1981.

"(2) The judgment of the court incorporated by reference a settlement agreement negotiated by the parties with the assistance and participation of counsel.

"(3) Both parties were present in court where the settlement agreement

At the hearing on this appeal, the defendant did not argue that this procedure denied her a fair trial, in view

was read into the record by defendant's counsel and both parties affirmed that they understood and agreed to its terms.

"(4) The settlement agreement was preceded by a trial which commenced on May 26, 1981 and which continued through May 27, 1981.

"(5) At the trial the plaintiff testified and was cross examined by counsel for the defendant.

"(6) The defendant also testified and presented as witnesses in her behalf, an expert on bowling centers operation, an actuary and a Certified Public Accountant employed in the plaintiff's business.

"(7) The defendant, through counsel, engaged the services of a Certified Public Accountant (Robert Gervasoni) to review and evaluate the material which had been obtained by her counsel through discovery.

"(8) Defendant's counsel conducted discovery in advance of trial, including depositions of the plaintiff, Nancy Mollo (the plaintiff's present wife), Estelle Josem (the plaintiff's bookkeeper), and Thomas Montanile (an employee of the plaintiff); the filing of interrogatories and requests for production of five years' documentation; at least two site visits to plaintiff's office by a certified public account [sic] (Robert Gervasoni) and a bowling center expert to inspect the plaintiff's books and records and those of his corporation; review of financial affidavits, tax returns, limited partnership agreements, pension and profit sharing plans, real estate records, bank statements, checks, credit card charges, personal and corporate financial records produced by the plaintiff; and, personal interviews with the plaintiff's present and former business associates, including managers and bar maids.

"(9) The plaintiff filed a financial affidavit dated May 26, 1981, in which he:

"(a) estimated that his income for the calendar year 1981 would be the same as or slightly less than his income for 1980, based upon his educated prediction that the recession would adversely affect the bowling business.

"(b) listed the net, after tax values of his interest in a limited partnership known as Georgetown at Enfield Associates as that interest appeared in the limited partnership agreement;

"(c) listed his interest in a closely held corporation known as Grayson Associates at book value with an explanatory note to the effect that the corporation's assets would be employed 'to pay future income to the plaintiff, for funding the pension plan and to meet expenses of doing business'; and,

"(d) listed his interest in a pension plan at its gross and net (after tax) values as at April 15, 1981.

"(10) To the extent that the plaintiff's actual income for the calendar year exceeded the sum projected on his May 26, 1981 financial affidavit the difference was attributable to:

"(a) the payment of management fees by Georgetown at Enfield Associates to the plaintiff's corporation—which fees were fully disclosed in financial

of the holding in *Cameron* v. *Avonridge, Inc.,* 3 Conn. App. 230, 235, 486 A.2d 661 (1985). The defendant

statements available to the defendant at the time of trial, but the date of payment of which was unknown at the time of trial, as it depended on the acts of third parties—and the subsequent distribution of those funds to the plaintiff in the form of increased salary:

"(b) an increase in the fees for management of three bowling centers by the plaintiff's corporation which was proposed by the plaintiff in September, 1981 and subsequently agreed to by approximately 100 limited partners in those bowling centers subsequent to May 28, 1981;

"(c) an increase in the percentage of plaintiff's partnership distribution from Georgetown at Enfield Associates (from 33 1/3% to 50%) taken by the plaintiff in July, 1981, at the time money became available for distribution, as compensation for plaintiff's disproportionate responsibility in the administration of the limited partnership; (This adjustment of the partners' interests was effectuated without the prior agreement of plaintiff's partners and was objected to by one of them (Leslie Barth) as testified to in the trial on this motion and as evidenced by a letter which is an Exhibit in this case.); and

"(d) the payment by one of the plaintiff's partners in Georgetown at Enfield Associates of a $15,000.00 'finder's fee' in connection by Georgetown at Enfield Associates.

"(11) All of the information pertaining to Georgetown at Enfield Associates was available to the defendant at the time of trial (Ruffkess testimony).

"(12) Defendant also had access to plaintiff's partners in Georgetown at Enfield Associates, one of whom (Leslie Barth) was present in the courthouse at the time of trial of the dissolution action at defendant's request.

"(13) The plaintiff did not know on May 26, 1981 that the distributions listed in paragraph 10 above would occur in calendar year 1981, nor was he able to predict with reasonable certainty what the precise amounts of those distributions would be. (The terms of the Georgetown at Enfield mortgage and the plaintiff's share in those mortgage proceeds which were fully disclosed and known to the defendant on May 25, 1981 (Ruffkess testimony), required payment in full by the mortgagees upon conversion of 50% of the units to condominiums and the sale of those units or, upon the expiration of five (5) years from the date of sale (August, 1984). Plaintiff could not have predicted on May 26, 1981, when the conversions and sales would take place).

"(14) On May 26, 1981, the defendant had access to all information which was then available to the plaintiff regarding Georgetown at Enfield Associates, the plaintiff's pension plan, Grayson Associates, Inc., the operation of the bowling centers, plaintiff's assets and his financial prospects.

"(15) Defendant maintained and attempted to demonstrate through actuarial testimony at the time of trial that plaintiff had understated the value of his pension plan.

"(16) Plaintiff did know and did fail to disclose on his financial affidavit

claimed, however, that the present case points out the wisdom of the *Cameron* court's reference to the "hazards that may result from such a practice." More specifically, she argues that the findings were advocate oriented, were found without evidence, and were ambiguous.[4]

The court stated in *Cameron* that "[t]he plaintiffs, relying on *United States* v. *Forness,* 125 F.2d 928 (2d Cir.), cert. denied sub nom. *City of Salamanca* v. *United States,* 316 U.S. 694, 62 S. Ct. 1293, 86 L. Ed. 1764 (1942), claim that the trial court erred in adopting the language in the defendant's brief as its memorandum of decision. *United States* v. *Forness,* supra, 942, states that 'a comparison of the findings with the opinion

---

that he was entitled to a 'finder's fee' (paragraph 10d above), although the amount of that fee had not been agreed upon and the plaintiff did not know at the time of trial when it might be paid.

"(17) There are no material misrepresentations in the plaintiff's May 16, 1981 affidavit.

"(18) There is no evidence of fraud in connection with the plaintiff's May 26, 1981 affidavit.

"(19) No evidence whatsoever has been offered regarding the plaintiff's 1981 or 1983 income and therefore the court cannot conclude that there is a substantial likelihood that the new trial would produce a different result.

"(20) The defendent's [sic] financial affidavit of April 30, 1981, used in the trial of this case, understated her income to the extent of $34,000.00 per year.

"(21) Defendent's [sic] counsel had all necessary information available to them at the time they advised the defendant to agree to the terms of the negotiated settlements.

"(22) Defendent [sic] actively participated in the settlement negotiations and, by her own testimony, 'sent her attorneys back' on several occasions in the course of those negotiations.

"(23) The plaintiff's 1981 income derived in part from an unusual set of circumstances (i.e. the Georgetown at Enfield distributions) and there is no evidence whatsoever that plaintiff's 1981 income level has ever been achieved before or since."

[4] The adoption of findings proposed by the parties is not new to our system of justice. Until July 1, 1979, the longstanding practice in the preparation of the record for appeal was for the trial court to consider proposed findings and counter-findings, submitted by the parties, in preparing the findings of fact in the case. See Practice Book, 1963, §§ 613-620.

seems to show that the findings proposed by the defendants were mechanically adopted, with the consequence that some of the findings made by the district court are not supported by the evidence and not substantially in accord with the opinion.' The case does not condemn the use of language in a brief of one of the parties but points out the hazards that may result. Here, the trial court specifically acknowledged in its memorandum of decision that it relied heavily on the defendant's trial brief because the facts and legal theories advanced therein were consistent with the court's views, and it did not believe that it could improve on the defendant's language. Although we do not approve of this practice, we cannot find that it resulted in less than a fair trial. Nor was there any manifest abuse of discretion or injustice. See *Long* v. *Schull*, 184 Conn. 252, 257–58, 439 A.2d 975 (1981)." *Cameron* v. *Avonridge, Inc.*, supra, 235.

In the leading case of *United States* v. *Forness*, supra, the court, while reversing the District Court on other grounds, stated the reasons for disapproving such a practice, in part, as follows: "We stress this matter because of the grave importance of fact-finding. The correct finding, as near as may be, of the facts of a law suit is fully as important as the application of the correct legal rules to the facts as found. An impeccably 'right' legal rule applied to the 'wrong' facts yields a decision which is as faulty as one which results from the application of the 'wrong' legal rule to the 'right' facts. The latter type of error, indeed, can be corrected on appeal. But the former is not subject to such correction unless the appellant overcomes the heavy burden of showing that the findings of fact are 'clearly erroneous.' " Id., 942.

"It is sometimes said that the requirement that the trial judge file findings of fact is for the convenience of the upper courts. While it does serve that end, it has

a far more important purpose—that of evoking care on the part of the trial judge in ascertaining the facts." Id.

We can add little to this statement except to note that the practice of adopting parties' proposed findings of fact invites error or sloppy analysis on the judge's part. More importantly, the appearance of justice is just as important as the reality, and a verbatim adoption of the facts proferred by one of the advocates invites a public suspicion of the trial court's decision. The perceptions by the public and by the losing litigant of our system of justice are surely not enhanced by such a practice.

In expressing our strong disapproval of such a procedure, we in no way impugn the trial judge in this case. Counsel at the hearing on this appeal made it clear that no attack was being made on the integrity or competency of the trial judge.

The court in *Cameron* v. *Avonridge, Inc.*, supra, noted that the trial court specifically acknowledged its heavy reliance on the defendant's trial brief in its memorandum of decision. No comment to that effect was made by the trial court in this case. Although the use of such a statement does not entirely vitiate the hazards in such a practice, it does have the very practical effect of showing that the trial court was consciously aware of the problems in this sensitive area and, presumably, that it acted in accordance with such awareness.

The propriety or impropriety of verbatim adoption is discussed in an annotation entitled "Findings Prepared by Prevailing Party," 54 A.L.R.3d 868. The author points out that no reported case has been found in which the objection has met with actual success at the appellate level. Id., 870. Nor have we found any such case. We concur with the unanimous authority that verbatim adoption of the findings submitted by the

prevailing party is not, per se, a ground for finding that the losing party did not have a fair trial.

The issue, therefore, is whether the trial court's findings are supported by the evidence and are in substantial accord with the opinion: "The defendants finally object to the findings on the ground that they were mainly taken verbatim from the government's brief. The findings leave much to be desired in light of the function of the trial court. See *United States* v. *Forness*, [supra], 942–43. But they are nonetheless the findings of the District Court. And they must stand or fall depending on whether they are supported by evidence. We think they are." *United States* v. *Crescent Amusements Co.*, 323 U.S. 173, 184–85, 65 S. Ct. 254, 89 L. Ed. 160 (1944). The ultimate test as to the adequacy of findings is whether they are sufficiently comprehensive and pertinent to the issues to provide a basis for the decision and whether they are supported by evidence. See *United Nuclear Corporation* v. *General Atomic Co.*, 96 N.M. 155, 629 P.2d 231 (1980). Although a few cases have held that the appellate court should scrutinize more carefully or give less weight to such prepackaged findings; 54 A.L.R.3d 868, 887, and supplement thereto; see *Garter-Bare Co.* v. *Munsingwear, Inc.*, 650 F.2d 975 (9th Cir. 1980); we do not adopt the reasoning of these few cases because a conscientious appellate court will make such examination of the record as is necessary in every case in which it is claimed that the finding is not supported by the evidence.

This court, after a meticulous examination of the parties' detailed factual claims and the entire record, has concluded that there was credible evidence for all of the court's findings and that the findings were substantially in accord with the opinion. Therefore, we find that the defendant was not denied a fair trial by the verbatim adoption of the prevailing party's proposed findings.

Clear judicial guidelines exist for our task of deciding whether or not the court's judgment in this case is clearly erroneous. It is in the application of these well established principles that the difficulty arises.

Dispositions of property made at the time of the decree under General Statutes § 46b-81 are not subject to modification even if there should be a change of circumstances. General Statutes § 46b-86 (a); *Viglione* v. *Viglione,* 171 Conn. 213, 215, 368 A.2d 202 (1976).

In dissolution actions particularly, both counsel and the court have special responsibilities with respect to agreements submitted by the parties. There must be reasonable inquiry into the wishes as well as the objective best interests of the client, and counsel have a special responsibility for full and fair disclosure and for a searching dialogue about all of the facts which materially affect the client's rights and interests. *Monroe* v. *Monroe,* 177 Conn. 173, 183, 413 A.2d 819, appeal dismissed, 444 U.S. 801, 100 S. Ct. 20, 62 L. Ed. 2d 14 (1979). "Although the law will intervene to insure that substantial justice is done where fraud has been perpetrated, the frequency and extent of this intervention must be tempered by a sometimes conflicting adjudicative proposition that mandates the ultimate conclusion of all legal controversy. Thus, the setting aside of a judgment on the basis of fraud 'will only be granted if the [movant] is not barred by any of the following restrictions: (1) There must have been no laches or unreasonable delay by the injured party after the fraud was discovered. (2) There must have been diligence . . . in trying to discover and expose the fraud. (3) There must be clear proof of the perjury or fraud. (4) There must be a substantial likelihood that the result of the new trial will be different. James, Civil Procedure (1965) § 11.7, pp. 540–42; [note,] 36 Ill. L. Rev. 894, 896-97 (1942).' *Varley* v. *Varley,* 180 Conn. 1, 4,

428 A.2d 317 (1980)." *Jucker* v. *Jucker,* 190 Conn. 674, 677, 461 A.2d 1384 (1983); see also *Jackson* v. *Jackson,* 2 Conn. App. 179, 189, 478 A.2d 1026, cert. denied, 194 Conn. 805, 482 A.2d 710 (1984). We conclude that the defendant did not meet the high standard of clear proof required for fraud. Considering the other three elements set forth in *Varley* v. *Varley,* supra, we note the following: (1) there was no question of laches on the part of the defendant; (2) since we sustain the trial court's judgment that there was not clear proof of fraud, we do not reach the issues of whether or not there was diligence on the defendant's part in trying to discover and expose the fraud or a substantial likelihood that the result of the new trial would be different.

Where the parties are in agreement as to the division of the marital property and as to alimony and support, the sworn financial statements of the parties assume great significance since they are submitted in lieu of testimony under oath. Accordingly, compliance with the rules concerning the filing of financial affidavits is essential in order for the court to make a reasoned decision with respect to such orders. See *Winick* v. *Winick,* 153 Conn. 294, 298, 216 A.2d 185 (1965). "Fraud consists in deception practised in order to induce another to part with property or surrender some legal right, and which accomplishes the end desired." *Alexander* v. *Church,* 53 Conn. 561, 562, 4 A. 103 (1886), quoting Cooley, Torts, p. 474.

"The case of *Miller* v. *Appleby,* 183 Conn. 51, 54–55, 438 A.2d 811 (1981), summarized the necessary elements of fraud as follows: 'The essential elements for an action in fraud . . . are: (1) that a false representation was made as a statement of fact; (2) that it was untrue and known to be untrue by the party making it; (3) that it was made to induce the other party to act on it; and (4) that the latter did so act on it to his injury.' " *Jackson* v. *Jackson,* supra, 193. A court is

entitled to rely upon the truth and accuracy of the sworn statements required by § 463 of the Practice Book, and a misrepresentation of assets and income is a serious and intolerable dereliction on the part of the affiant which goes to the very heart of the judicial proceeding. *Casanova* v. *Casanova,* 166 Conn. 304, 305, 348 A.2d 668 (1974).

The defendant focused her claim of fraud in the plaintiff's affidavit on the following summary of undisputed evidence:

| | "Plaintiff's Affidavit (May 26, 1981) | Amount Received (1981) | Amount Undisclosed (May 26, 1981) |
|---|---|---|---|
| INCOME: | | | |
| Salary from Grayson Associates | $82,000 | $108,200 (July 31, 1981) | $26,200 |
| Income from Management Fees from Georgetown Paid to Grayson Associates | -0- | $42,879 (August 1981) | $42,897 |
| Commission from Leslie Barth | -0- | $15,000 (August 1981) | $15,000 |
| TOTAL INCOME | $82,000 | $166,079 | $84,079 |
| ASSETS: | | | |
| Georgetown at Enfield: | | | |
| .17% interest | 959.76 | | |
| 8% interest | $46,080 (8.17% valued at $66,000 gross in Plaintiff's testimony) | $165,553 (July 1981) | $99,553 |
| TOTAL ASSETS: | $47,039.76 | $165,553 | $99,553" |

In calculating the $99,553 amount, the defendant used the figure more favorable to the plaintiff, i.e., the gross value of the 8.17 percent interest testified to by the plaintiff in 1981 rather than the amount listed on his affidavit.

The defendant stresses four principal instances in which she claims that the court's findings were unsupported by, or were contrary to the evidence. First, she cites the plaintiff's statement that his 1981 income would be the same or slightly less than his 1980 income when, in fact, his income for 1981 from Grayson Associates, Inc., was $108,200 rather than the salary of $82,000 from this source shown on his affidavit. Second, she questions finding number 19 that "[n]o evidence whatsoever has been offered regarding the plaintiff's 1981 or 1983 income," and the related finding, number 23, that "the plaintiff's 1981 income derived in part from an unusual set of circumstances (i.e. the Georgetown at Enfield distributions) and there is no evidence whatsoever that plaintiff's 1981 income level has ever been achieved before or since." Third, she challenges finding number 10 concerning the increase in the plaintiff's actual income over his projected income due to the payment of accrued management fees to Grayson Associates, Inc., by Georgetown at Enfield Associates in August, 1981, in the amount of $42,879, in light of the plaintiff's statement on his affidavit, in paragraph four under the heading of "Income," that "no income in the future will be received from Georgetown at Enfield Associates."

Fourth, the defendant questions finding number 10 (c), concerning the valuation of the plaintiff's interest in Georgetown at Enfield Associates. The value listed in the affidavit was $46,080, although the defendant's summary of claimed misrepresentations used the figure of $66,000 based on the plaintiff's testimony in 1981. The plaintiff actually received $165,533 in July,

1981, largely as a result of his taking a one half rather than a one third share in the proceeds of the payoff of a mortgage to the investors after more than 50 percent of the condominium units had been sold. The defendant argues that this chain of events demonstrates that the plaintiff controlled the distribution of proceeds and knew, when he filed the affidavit, that such a distribution would be forthcoming. The defendant has also raised several other objections to the trial court's findings which we have considered and which we conclude are without merit. Concerning the defendant's specific challenges to the court's findings as described above we conclude as follows:

(1) Concerning the plaintiff's 1981 income from Grayson Associates, Inc., in the amount of $108,200, we note that Grayson Associates, Inc.'s tax return was filed on a fiscal year basis ending July 31, 1981, and the plaintiff was on a calendar tax year. The court found, in finding number 10 (b) that this larger income was due to an increase in fees for the management of the three bowling centers, proposed by the plaintiff in September, 1981, and subsequently agreed to by 100 limited partners. The defendant questions how a September, 1981 increase could account for a larger payout from Grayson Associates, Inc., as of July 31, 1981. The defendant is correct that this is a questionable finding. Our review of the transcript reveals testimony of Martin Ruffkess, C.P.A., which would largely attribute this increase to the reimbursement, earlier than had been the practice in the past, to Grayson Associates, Inc., from the bowling alleys for amounts advanced for resurfacing the alleys. We conclude, however, that this questioned finding does not shake the underpinning of the court's judgment.

(2) The court's finding number 19, that no evidence whatsoever has been offered regarding the plaintiff's 1981 (the parties agree this should read 1982) and 1983

income, was not entirely correct. The plaintiff's exhibit 15, the 1982 tax return of Grayson Associates, Inc., shows a salary to the plaintiff of $106,000. This deficiency in the finding is not a substantial one since the court's corollary finding, that there was no evidence that the plaintiff's 1981 income had ever been achieved before or since, is substantially supported in the record if "income" is taken in its ordinary sense to be money received from all sources, including capital, which amount the defendant herself claims was $166,079 in 1981 rather than the $82,000 shown on plaintiff's affidavit.

(3) The claim concerning misrepresentation in the statement on the plaintiff's affidavit that no income in the future will be received from Georgetown at Enfield is the most serious challenge to the evidentiary underpinning of the court's judgment.

The defendant points out that finding 10 (a), concerning management fees paid by Georgetown at Enfield to Grayson Associates, Inc., states only that "the fees were fully disclosed in financial statements available to the defendant at the time of trial, but the date of payment of which was unknown at the time of trial, as it depended on the acts of third parties." The defendant stresses that the finding did not say that the plaintiff did not know the amount to which he was entitled but only that he did not know the date of the payment.

The statement on the plaintiff's affidavit that no income in the future will be received from Georgetown at Enfield Associates is misleading, at best, in the light of the court's failure to find that the management fees later received by the plaintiff were not known to him on May 25, 1981. The defendant apparently argues that such a categorical misstatement in an affidavit is a mandatory basis for opening the judgment on the ground of fraud, regardless of the defendant's other knowledge

concerning the matter gleaned from extensive discovery by the defendant. Two considerations dispose of this argument. Although the defendant is correct in pointing out the court's omission and the reasonable implication to be drawn from this, that the plaintiff knew on May 25, 1981, of the increased payments to be made to him, she failed to move to articulate the memorandum of decision under Practice Book § 3082 concerning the issue involved. *In re Juvenile Appeal (85-1),* 3 Conn. App. 158, 161, 485 A.2d 1355 (1985). More significantly, we decline to adopt a rule that any misrepresentation in an affidavit, if it be one, automatically requires a finding of fraud on the court's part. The legal framework for consideration of such a fraud claim has been carefully delineated in the cases cited above. Here, the court stressed the defendant's detailed knowledge of the Georgetown at Enfield situation. It was for the court to decide, on the basis of the totality of the circumstances, whether or not there was clear proof of fraud under the criteria referred to.

(4) Finding number 13 provides that "the plaintiff did not know on May 26, 1981 that the distributions listed in [finding] 10 above [concerning Georgetown at Enfield] would occur in calendar year 1981, nor was he able to predict with reasonable certainty what the precise amounts of those distributions would be." Once again the finding stressed the defendant's knowledge of the Georgetown at Enfield mortgage. Further, the defendant points out that the court did not find that the plaintiff did not know, on May 26, 1981, of further distributions coming from Georgetown at Enfield. The same comment as previously made concerning her failure to file a motion to articulate the memorandum of decision is pertinent at this point.

The claim that this finding undermines the court's conclusion of the absence of fraud is without merit. When it is confined to the equity distribution at George-

town at Enfield there is substantial credible evidence in the record to sustain such a finding. Here, we are faced, not with a categorical statement akin to "no income in the future will be received," but rather with the statement on the plaintiff's affidavit about "equity to be received in the future" at a figure which turned out to be substantially less than that actually received.

Overall, the defendant's claim of fraud is based on occurrences after the dissolution which resulted in substantially larger income to the plaintiff than his affidavit indicated could be expected. Since there is no direct proof of such fraud, her case necessarily rests on inferences which she claims the court should have drawn from the evidence.

There is certainly present in this case a high degree of suspicion that the plaintiff, on May 26, 1981, contemplated or had prearranged the larger payments. The plaintiff's business structure and experience as a sophisticated businessman made it possible for him to pump up the financial pipelines to his benefit. Mere speculation or suspicion as to such an inference is not, however, sufficient to mandate a finding of clear evidence of fraud. It is axiomatic that the credibility of witnesses, the finding of facts, and the drawing of inferences are all in the trier's province. "It is futile to assign error involving the weight of testimony or the credibility of witnesses." *Slattery* v. *Maykut,* 176 Conn. 147, 149, 405 A.2d 76 (1978); see also *Piantedosi* v. *Floridia,* 186 Conn. 275, 277, 440 A.2d 977 (1982); *Filosi* v. *Hawkins,* 1 Conn. App. 634, 641, 474 A.2d 1261 (1984); *Zolan, Bernstein, Dworken & Klein* v. *Milone,* 1 Conn. App. 43, 46, 467 A.2d 938 (1983).

From our appellate perch, the temptation to second guess the trial court's factual conclusions is very seductive. We must be ever mindful, however, of our limited role in such a case. We must not operate as some sort

of judicial piranha nibbling away at the court's findings. The question is not whether this court might have reached the same conclusion concerning the subordinate facts found or reasonable inferences therefrom but whether the trial court could not reasonably have concluded as it did. We conclude that there was sufficient credible evidence to justify the trial court's finding of subordinate facts and that the finding of no clear evidence of fraud was not clearly erroneous.

The defendant strenuously argues that the case of *Jackson* v. *Jackson,* 2 Conn. App. 179, 478 A.2d 1026 (1984), supports her position. The defendant claims that her case is even stronger than that of the successful appellant in *Jackson* wherein the court found that the trial court's refusal to open the dissolution judgment on the ground of fraud was clearly erroneous. In *Jackson,* the defendant had stipulated to a dissolution judgment in the mistaken belief that she was to get slightly less than one half of what the plaintiff's affidavit represented was 4277 shares of stock in C 3, Inc. In fact, during the negotiations leading to the stipulation, the plaintiff had received a three-for-one stock split so that at the time of the dissolution he owned 12,831 shares rather than the 4277 shares shown on his affidavit. This split was unknown to the defendant despite due diligence on the part of her and her attorney. As a result, the defendant received one sixth of the stock worth approximately $400,000, rather than almost exactly one half of it. The court in *Jackson* noted that the disparity in the division of the stock was very substantial. Id., 181. This was particularly so in view of the very modest other financial arrangements of the parties.[5]

[5] The disparity in distribution may not only be circumstantial evidence of fraud but is also highly relevant to the fourth criterion of the necessary elements to open a dissolution judgment on the ground of fraud; that is that there must be a substantial likelihood that the result of the new trial will be different. *Varley* v. *Varley,* 180 Conn. 1, 4, 428 A.2d 317 (1980);

The defendant misreads *Jackson* as it relates to this case. In *Jackson,* the court's decision reversing the trial court's finding of no fraud grew out of very compelling evidence to the contrary. The three-for-one stock certificates in the plaintiff husband's hands constituted the "smoking gun" of fraud practiced by the plaintiff in his affidavit *at the time of the dissolution.* It was crystal clear that Mr. Jackson knew Mrs. Jackson did not know of the stock split because before the final stipulation leading to the dissolution she wrote to her lawyer asking him to try to get 2138 of the shares rather than 2000 shares because 2138 shares represented more exactly one half of the plaintiff's stock. Id., 185. The *Jackson* case reeked of fraud, unlike the case here.

The defendant in this case is attempting to move *Jackson* to the next plateau. She seeks a holding that the trier must infer that prior knowledge of financially favorable events which occur soon after the filing of a party's financial affidavit existed at the time of the filing. Although a trial court may, upon review of all of the facts, including the fact of a party's rapid improvement in financial condition, conclude that fraud was present as of the date of dissolution, the trial court did not do so here. Such a fact, standing alone, carries no mandatory inference.

We must steer a careful course between the Scylla of *Jucker* v. *Jucker,* 190 Conn. 674, 461 A.2d 1384 (1983), where the court sustained the trial court's finding of no fraud, and the Charybdis of *Jackson* v. *Jackson,* supra, where the fraud leaped out of the record.

To do so, we must balance two fundamental principles of law. We are well aware of the limited role of

---

*Jucker* v. *Jucker,* 190 Conn. 674, 677, 461 A.2d 1384 (1983); *Jackson* v. *Jackson,* 2 Conn. App. 179, 191, 478 A.2d 1026 (1984). Regarding disparity, see *Baker* v. *Baker* 187 Conn. 315, 320 n.5, 445 A.2d 912 (1982).

this court in reviewing factual findings of the trial court, particularly in domestic cases. "A factual finding may be rejected by this court only if it is 'clearly erroneous.' Practice Book § 3060D." *Kaplan* v. *Kaplan,* 186 Conn. 387, 392, 441 A.2d 629 (1982). The trier of fact has wide latitude in its interpretation of the evidence and the conclusions to be drawn therefrom. " '[T]rial courts have a distinct advantage over an appellate court in dealing with domestic relations, where all of the surrounding circumstances and the appearance and attitude of the parties are so significant.' " *Figlar* v. *Figlar,* 174 Conn. 151, 153, 384 A.2d 1 (1978). "This court may not substitute its own opinion . . . for the factual finding of the trial court." *Kaplan* v. *Kaplan,* supra.

"We are equally aware of the danger of opening the floodgates to a wave of motions to open dissolution judgments by dissatisfied litigants. Where, as in this case, however, a clear case is made under applicable law that a fraudulent and material misrepresentation by one party resulted in a substantial injustice to the other party, we must not hesitate to act. This is such a case." *Jackson* v. *Jackson,* supra, 196.

In view of the necessary deference to the findings of the trial court in dissolution cases and the companion need for finality in judgments, we conclude that this is not such a case. The judgment of the trial court was not clearly erroneous.

There is no error.

In this opinion DUPONT, C.P.J., concurred.

BORDEN, J., dissenting. I dissent.

I

I would apply to the "findings" of the trial court in this case a more exacting standard than employed by

the majority. I would, as some jurisdictions have done, apply a test of strict scrutiny. See, e.g., *Garter-Bare Co.* v. *Munsingwear, Inc.,* 650 F.2d 975 (9th Cir. 1980) and cases cited therein; annot., 54 A.L.R.3d 868, 887–88. This standard of review of the trial court's factual determinations requires more than deciding, as we normally do under a "clearly erroneous" standard, whether the findings are supported by some credible evidence. It requires us to make "a scrupulous examination of the record to ascertain whether such . . . finding[s] [are] *supported by substantial evidence.*" (Emphasis added.) *State* v. *Zayas,* 3 Conn. App. 289, 297, 489 A.2d 380 (1985). I would employ this heightened standard in this case because of a coalescence of three factors: the important purposes of factual findings of a trial court; the fact that this is a marital dissolution case; and the way in which these findings were adopted and expressed.

First, as the majority recognizes, *United States* v. *Forness,* 125 F.2d 928 (2d Cir.), cert. denied sub nom. *City of Salamanca* v. *United States,* 316 U.S. 694, 62 S. Ct. 1293, 86 L. Ed. 1764 (1942), in an opinion authored by Judge Jerome Frank and joined by Judges Augustus Hand and Charles Clark, identified the two central purposes of requiring a trial judge to file factual findings: to facilitate appellate review; and to ensure that the trial judge takes care in ascertaining the facts. "It is sometimes said that the requirement that the trial judge file findings of fact is for the convenience of the upper courts. While it does serve that end, it has a far more important purpose—that of evoking care on the part of the trial judge in ascertaining the facts. For, as every judge knows, to set down in precise words the facts as he finds them is the best way to avoid carelessness in the discharge of that duty: Often a strong impression that, on the basis of the evidence, the facts are thus-and-so gives way when it

comes to expressing that impression on paper. The trial court is the most important agency of the judicial branch of the government precisely because on it rests the responsibility of ascertaining the facts. When a . . . trial judge sits without a jury, that responsibility is his. And it is not a light responsibility since, unless his findings are 'clearly erroneous,' no upper court may disturb them. To ascertain the facts is not a mechanical act. It is a difficult art, not a science. It involves skill and judgment. As fact-finding is a human undertaking, it can, of course, never be perfect and infallible. For that very reason every effort should be made to render it as adequate as it humanly can be." Id., 942–43; see also *International Controls Corporation* v. *Vesco,* 490 F.2d 1334, 1341 n.6 (2d Cir. 1974), cert. denied, 417 U.S. 932, 94 S. Ct. 2644, 41 L. Ed. 2d 236 (1974) (disapproving and "roundly condemn[ing]" trial judge's adoption in toto of factual findings submitted by counsel).

Second, this is a marital dissolution case. Few, if any, judicial proceedings match such a case for emotion-laden content. "Analogies drawn from commercial litigation fail to respond adequately to the situation of emotional trauma commonly associated with the irretrievable breakdown of a marriage." *Monroe* v. *Monroe,* 177 Conn. 173, 182, 413 A.2d 819, appeal dismissed, 444 U.S. 801, 100 S. Ct. 20, 62 L. Ed. 2d 14 (1979). It "put[s] two persons, who once shared life's tenderest intimacies, in a position of combat." *Jackson* v. *Jackson,* 2 Conn. App. 179, 186–87, 478 A.2d 1026 (1984). These considerations compel the conclusion that, perhaps more than in other types of cases, in marital cases "the continued vitality of our judicial system rests in part on the continued perception on the part of its participants of the basic fairness of its procedures." *Gennarini* v. *Gennarini,* 2 Conn. App. 132, 138, 477 A.2d 674 (1984).

Because of these considerations, a trilogy of our precedents has established the principle that, in the settlement of marital disputes, full and frank disclosure of essential facts is required among all the participants in the process: counsel, clients and court. In *Monroe* v. *Monroe,* supra, 183, the Supreme Court emphasized the need for that disclosure between counsel and client. In *Baker* v. *Baker,* 187 Conn. 315, 445 A.2d 912 (1982), that court applied the principle to the disclosures required between the litigants and their counsel, on one hand, and the court on the other. Not long ago, this court applied the same principle to the requirements of disclosure between the adversary sides. "Only full and frank disclosure can facilitate such settlements. Whatever the situation may be in contested dissolution actions, there should be at least a Geneva Convention of rules of war where the parties are able to work out the matter themselves." *Jackson* v. *Jackson,* supra, 188.

The reasons for this principle are obvious. It is essential to the implementation of our strong policy that the "private settlement of the financial affairs of estranged marital partners is a goal that courts should support rather than undermine." *Baker* v. *Baker,* supra, 322; *Hayes* v. *Beresford,* 184 Conn. 558, 568, 440 A.2d 224 (1981); *Lavigne* v. *Lavigne,* 3 Conn. App. 423, 426, 488 A.2d 1290 (1985). Our support of that goal will be effective only if we instill confidence in marital litigants that we require, as a concomitant of the settlement process, such full and frank disclosure from both sides, for then they will be more willing to forego their combat and to settle their dispute privately, secure in the knowledge that they have all the essential information. In addition, this principle of disclosure facilitates the task of the court to ensure that settlement agreements are substantively fair and knowingly negotiated. *Baker* v. *Baker,* supra, 321. Finally, and most poignantly, the settlement of a marital dissolution case is not like the

settlement of an accident case. It stamps with finality the end of a marriage. "Marriage is a coming together for better or for worse, hopefully enduring, and intimate to the degree of being sacred. It is an association that promotes a way of life, not causes; a harmony in living, not political faiths; a bilateral loyalty, not commercial or social projects." *Griswold* v. *Connecticut,* 381 U.S. 479, 486, 85 S. Ct. 1678, 14 L. Ed. 2d 510 (1965). Courts simply should not countenance either party to such a unique human relationship dealing with the other at arms' length. Whatever honesty there may, or should, have been during the marriage should at least be required by the court at its end.

These are the teachings of our cases. They represent the distilled wisdom of most judges who have presided over such unhappy proceedings. The approach of the majority in this case is an unfortunate step back from the sunshine of those teachings. I cannot square that approach with the clear step which this court so wisely took in *Jackson* v. *Jackson,* supra.

Third, unlike *Cameron* v. *Avonridge, Inc.,* 3 Conn. App. 230, 235, 486 A.2d 661 (1985), here the trial court mechanically adopted all the proposed findings of the plaintiff and added none of its own, without any recognition in its memorandum of decision that it was doing so and without any explanation for such a radical departure from the norm of the judicial process. Indeed, following a hearing lasting four days, it filed its memorandum of decision within eighteen days after the plaintiff submitted his posthearing brief, an alacrity of decision making which, under other circumstances, would be admirable, given the heavy caseload under which our trial court judges labor. It adopted verbatim the twenty-three critical paragraphs of facts articulated by the plaintiff, apparently without even proofreading them for improper grammar or misspelling. See footnote 3 to the majority opinion: finding

number 8 ("by a certified public account"); finding number 20 ("The defendent's"); finding number 21 ("Defendent's"); and finding number 22 ("Defendent"). It adopted the plaintiff's proposed findings *in toto*, a practice which persuasive and respected judicial authority has "expressly disapproved." *Apex Oil Co.* v. *Vanguard Oil & Service Co.*, 760 F.2d 417, 421–22 (2d Cir. 1985) (Newman, J.), citing *International Controls Corporation* v. *Vesco*, supra.

Such a process can only foster in the litigants' minds deep skepticism that the findings of the trial judge were truly " 'the product of the workings of [his] mind . . . .' " *Apex Oil Co.* v. *Vanguard Oil & Service Co.*, supra, 422. This can only undermine the marital litigants' perception of the basic fairness of the process by which their claims were decided, a perception which is essential to the continued vitality of our judicial system. *Gennarini* v. *Gennarini*, supra, 138. Therefore, we as an appellate court have an obligation to review the results of that process with strict scrutiny, so as to attempt to redress that perceived unfairness.

I disagree with the basis of the majority's rejection of the strict scrutiny standard, namely, that a conscientious appellate court will always scrupulously examine the trial court record. The issue is not whether we scrupulously examine the record. The issue involves the standard by which we gauge what that examination yields. I believe that, under the unique circumstances of this case, we should require that the findings be supported, not just by some credible evidence, but by substantial evidence.

We are quite accustomed to applying that more exacting scope of review of factual determinations of the trial court when strong reasons of policy demand it. See, e.g., *State* v. *Zayas*, 3 Conn. App. 289, 297, 489 A.2d 380 (1985) (record upon which finding of waiver of

*Miranda* rights based must be scrupulously examined to ascertain whether finding supported by substantial evidence); see also *Jazlowiecki* v. *Cyr*, 4 Conn. App. 76, 78, 492 A.2d 516 (1985) ("charge of judicial bias or prejudice strikes at the very core of judicial integrity and requires that the record be examined with infinite care").[1] This standard is a useful tool of the appellate trade, when supported by strong reasons of policy. The circumstances of this case compel its use.

## II

Applying the strict scrutiny standard to the "findings" of the trial court, I conclude that they do not pass muster. It would serve little purpose in this dissent to go through them item by item and compare them to the evidence, as the majority has done. Indeed, even the majority views three of the four challenged factual determinations of the trial court as "questionable," "not entirely correct" and "misleading at best," and the majority, even from its "appellate perch," perceives "a high degree of suspicion" about the plaintiff's truthfulness in his financial affidavit. Despite the Herculean effort of the majority to insert a firm foundation under an already crumbling edifice, I am persuaded that critical findings are not supported by substantial evidence, and that a new hearing is warranted.

I would, therefore, find error and remand the case for a new hearing on the defendant's motion to open the judgment.

---

[1] Likewise, we are equally capable of subjecting, in appropriate circumstances, factual determinations of the trial court to a less critical eye than is the norm. See *Babiarz* v. *Hartford Special, Inc.,* 2 Conn. App. 388, 480 A.2d 561 (1984).