[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION
This matter comes before the court on the defendant's post-judgment motion to modify the judgment regarding unallocated alimony and support. The hearing was held on December 9, 1997. Post-trial briefs were filed on January 21 and 22, 1998.
"[To avoid re-litigation of matters already settled, courts in modification proceedings allow the parties only to percent evidence going back to the latest petition for modification. . . . Alimony decrees may only be modified upon proof that relevant circumstances have changed since the CT Page 1589 original decree was granted." H. Clark, Law of Domestic Relations (1968) 14.9, p. 456." Borkowski v. Borkowski, 228 Conn. 729, 735-6, 638 A.2d 1060
(1994).
The parties were divorced on July 15, 1992. The judgment of dissolution of marriage incorporated a Separation Agreement between the parties. The agreement provision made a part of the judgment which the defendant seeks to modify provides:
 "Wife will receive as unallocated alimony and support from Husband the sum of Ninety-Eight Thousand Eight Hundred Dollars ($98,800.00) per year, payable on the 1st day of each month at the rate of $8,233.33 per month. Said unallocated alimony and support shall continue until the minor child Elizabeth Rachel reaches age eighteen, six months and one day. At that time, the Husband will be free to seek a modification of said unallocated alimony and support order taking into consideration that the minor child shall have reached majority . . . "Said award of unallocated alimony and support is based on the 1991 income of Husband, who represents it to be in the attached financial affidavit of Husband (dated 6/23/92) Two Hundred Forty-Six Thousand Four Hundred Ten Dollars ($246,410.00); and the income of the wife as shown in her attached affidavit dated 6/23/92.
 "It is further agreed that an increase or decrease of Twenty-Five Thousand Dollars ($25,000.00) in annual income by either party would not be a ground to modify paid award. (This means gross annual income exclusive of net loss carried forward)."
The alimony is to continue until the plaintiff is 62 years of age, unless it sooner terminates on either party's death, the plaintiff s remarriage or her cohabitation with an unrelated male. None of these triggering events have occurred. The minor child, Elizabeth Rachel, was born March 30, 1980; the trigger date based on her majority, then, is October 1, 1998. That date has not yet been reached.
The statutory standard for a modification of an unallocated alimony and support order is found in Connecticut General Statutes section 46b-86a: "Modification of alimony or support orders and judgments. (a) Unless and to the extent that the decree precludes modification, any final order for the periodic payment of permanent alimony or support or an order for alimony or support pendente lite may at any time thereafter be continued, set aside, altered or modified by said court upon a showing of a substantial change in the circumstances of either party. " CT Page 1590
On July 15, 1992, the plaintiff filed a financial affidavit with the court which disclosed no income. Her employment was as owner of a catering business, Perfect Parties, Inc., which has been in existence since the beginning of 1989. At the time of the dissolution, the business was operating at a loss, with reported losses for the three previous years of $27,269.00 (1989), $52,519.00 (1990) and $14,000.00 (1991).
At the time of the present hearing, the plaintiff continued to operate Perfect Parties, Inc. No income was reported from that business on her financial affidavit. Her testimony disclosed that all of the loans she had floated to the business over the years had been repaid and she now anticipated the business would no longer operate at a loss. The casual bookkeeping surrounding Perfect Parties, Inc. makes these assertions difficult to evaluate. Much of the labor subcontracting was paid personally by the plaintiff. Whether or how these sums have been repaid or accounted for was not made clear to the court.
What is crystal clear is that the plaintiff could not economically afford to run Perfect Parties on the basis of its reported losses without an independent means of support. At the time of dissolution, July 15, 1992, the defendant's unallocated payments of $8,233.33 to the plaintiff provided that support.
At the time of dissolution, the defendant was fully employed as a General Agent for the Guardian Life Insurance Company. His financial affidavit, dated June 23, 1992, utilized his 1991 income. His gross income was $246,410.00, net income was $177,695.00 per year, or $3,417.23 per week. With indirect income he had a weekly net income of $3,726.18.
Further along in his 1992 financial affidavit, the defendant asserted that his "General Agency Terminal Equity" was not an asset; rather, he represented it to be a portion of his income. As excerpted from his sworn financial affidavit dated June 23, 1992, the defendant stated:
 "(Present value of General Agency Terminal Equity is $365,337.00. However, this is not payable unless defendant dies or has his General Agency terminated in which event is paid out of as annual renewal premiums as outstanding policies are paid. During the existence of defendant's General Agency — the annual allocations of renewal premium commissions are paid as a part of his commission income reported in Paragraph I [weekly income] above. Therefore, this sum is not an asset as such because it is a part of defendant's income annually.)"
Subsequent to the parties' dissolution of marriage in late 1994, the CT Page 1591 defendant experienced a severe heart attack. He was out of work for a period of time. When he went back to work, these health problems continued. Ultimately, he applied for disability status and benefits under various plans available to him. He resigned from his General Agency partnership and began to receive disability benefits as of December 31, 1995. It is as a result of this change and the defendant's income position, as he states it, that he seeks a modification of his unallocated alimony and support obligation.
The defendant's current sworn Financial Affidavit (signed November 17, 1997) discloses gross weekly income of $2,123.08 and net weekly income of $1,822.86. This weekly reporting income is largely comprised of disability income from two different policies.
The defendant also reports that he receives weekly payments of $1,873.88 for his General Agency Terminal Equity pay out. The evidence disclosed that this sum is paid out under a commission spreading agreement between the defendant and Guardian. This agreement (Exhibit G) allows for a level monthly payment of sums due to the defendant upon termination of his Agreement of General Agency with The Guardian Life Insurance Company of America. The sums represent ". . . certain deferred first-year commissions and renewal commission." The sums accumulate to the defendant's benefit in an account, which he has elected to receive at the following rates:
 From 7/1/96 to 6/30/98 $8,333.33/month. From 7/1/98 to 6/30/02 $9,333.33/month From 7/1/02 and thereafter $8,333.33/month.
The defendant represents that the receipt of these sums are not income. He argues that the sums represent liquidation of an asset, that is his interest in the General Agency.
Plaintiff argues that these sums are income: that by their nature they are income, and, the defendant having classified these sums as income in 1992 should be estopped from reclassifying them as an asset in 1997.
Finally, as to other income sources, both the plaintiff and the defendant are receiving monthly payments from their deferred compensation accounts. At the time of the parties dissolution of marriage in 1992, a portion of the defendant's deferred compensation account was assigned over to the plaintiff. The parties each report on their present financial affidavits that the defendant's disability has triggered both parties' accounts from deferred to pay status. The parties each elected a specific payment option for their deferred compensation. The plaintiff receives $961.54 weekly and the defendant receives $2,002.38 weekly. CT Page 1592
At the time of the dissolution of the parties' marriage, there was a division of assets, which included the assignment to the plaintiff of a portion of the defendant's deferred compensation account (now in pay status as related above.) The account was valued, by defendant, at $880,431.00 on June 23, 1992 for the July 15, 1992 final hearing. Of that sum, $500,000.00 was segregated to the sole benefit of the plaintiff. There is no dispute between the parties that this division of the Guardian Deferred Compensation Plan was part of the asset division of the parties. The issue remains, however, whether this court should treat the monthly payments as income to the parties for consideration of whether there has been a substantial change of circumstances in the parties' status since the date of dissolution of marriage. The plaintiff's account has enjoyed the benefit of accruals from 1992 to the present. The defendant's account has had the benefit of both accruals and deposits during that same period of time. The payments both parties receive will remain level throughout the balance of their respective lifetimes. The defendant argues that consideration of deferred compensation monies is impermissible because it would constitute `double-dipping', since the accounts were already divided. In plain language, he argues that since there has already been an asset division, it would be unfair to take a second look at his account for alimony purposes.
I. The payout of the General Agency Terminal Equity
The pivotal question in this matter is whether the sums received by Mr. Parri under the Spreading of Commissions Agreement for his General Agency Terminal Equity should be considered as income. Mr. Parri urges this court to not define it as income. He himself defined it as income in 1992. In 1992, the trial judge relied on his affidavit defining the General Agency Terminal Equity as income. If the trial court had not had this representation made to it by defendant and had instead considered it an asset of over $365,000.00, this undoubtedly would have altered the division of assets.
Mr. Zangari, a Certified Public Accountant and an attorney testified on behalf of the plaintiff that the sums being paid to Mr. Parri under the Spreading of Commissions Agreement are all taxable income to him, as defined by the Internal Revenue Code.
In the matter of O'Bymachow v. O'Bymachow, 12 Conn. App. 113,529 A.2d 743 (1987) the Supreme Court considered an analogous situation. In CT Page 1593O'Bymachow, at the time of the parties' dissolution of marriage in 1982, the plaintiff had disclosed he had two businesses which he listed as "value unknown". He assigned no value to them in his financial affidavit. This zero value was before the court which approved the parties' agreement. Then in 1985, when the defendant sought an alimony modification, the plaintiff disclosed his two business values to presently be $202,000.00. Further, in his testimony in 1985, the defendant explained that the businesses had really been worth $250,000.00 in 1982. The Supreme Court held that the trial court, in ruling on the motion for modification in 1985, should consider the businesses' value as of 1982 as presented by the defendant's sworn affidavit in 1982. The Supreme Court ruled:
 "In October, 1982, the plaintiff in effect attributed no value to his businesses on his financial affidavit. Both the defendant and the court were entitled to rely on that evidence at that time. See Grayson v. Grayson, 4 Conn. App. 275, 494 A.2d 576 (1985), appeal dismissed, 202 Conn. 221, 520 A.2d 225 (1987). Presumably, that was one of the factor which induced the trial court, Ottaviano, J., to approve the agreement of the parties. Furthermore, since the plaintiff was the owner of the businesses, he had the easier access to the information as to their values, and thus he had the greater obligation to present that information both to the court and to the defendant. Under these circumstances, it would be unfair and inequitable to permit him on October, 1985, to take advantage of values which he did not disclose in October, 1982. To put in another way, in establishing a change of circumstances, the defendant was entitled to take as a starting point the values of the businesses as displayed to her and to the court at the time of the original judgment. Viewed through this lens, the increase in the values of the plaintiff's businesses from "unknown" or zero in October, 1982, to $202,000.00 in October, 1985, must be viewed as substantial and unforeseen." O'Bymachow at 118-199.
Defendant, nevertheless, argues that the General Agency Terminal Equity can, rationally and consistently, be considered an asset now, while having been considered income in 1992. The determinant factor of his retirement, he argues caused the conversion. The commission, being paid in his retirement are based on his past performance and will ultimately terminate, since he is no longer working.
To consider this argument, the court must first consider the defendant's credibility. The following additional facts are found. The defendant is remarried. He entered into a premarital agreement with his new wife. On or about June 1, 1994 as a part of that premarital agreement, he submitted a Schedule A which was his statement, at that time, of his income and assets and liabilities. At that time, on or about June 1, 1994, Mr. Parri listed CT Page 1594 his Guardian General Agency as an asset with a market value of $530,000.00. This was his General Agency Terminal Equity as classified by him as income on his July 15, 1992 financial affidavit, two years before. On and about June 1, 1994, Mr. Parri was still working as a General Agent. His heart attack did not occur until a full five months later. Therefore, the defendant's argument to this court that the retirement caused the conversion of the General Agency Terminal Equity from classification as income to classification as an asset is disengenuous. Mr. Parri certainly did not believe so on June 1, 1994. The mere act of retirement does not, in any case, as a matter of law, work to convert income to an asset. No case law has been put forth by plaintiff for this proposition.
Under certain circumstances, the deferral and accrual of income to a later date will result in treatment of that fund as an asset. However, the plaintiff had the right to rely on the financial affidavit filed by the defendant in 1992. "Where the parties are in agreement as to the division of the marital property and as to the alimony and support, the sworn financial statements of the parties assume great significance since they are submitted in lieu of testimony under oath." Grayson v. Grayson,4 Conn. App. 275, 287, 494 A.2d 576, app. dismissed, 202 Conn. 221,520 A.2d 225 (1987). The plaintiff and the trial court relied on these representations made under oath in 1992 and continue to today.
The plaintiff's deferral of commissions merely deferred the receipt and, therefore, tax recoginition of income to a later date. The payments to Mr. Parri under the Spreading of Commissions Agreement paying out his General Agency Terminal Equity are, as re-recited from his July 15, 1992 financial affidavit," this [the General Agency Terminal Equity]is not payable unless defendant dies or has his General Agency terminated in which event is paid out of as annual renewal premiums as outstanding policies are paid. During the existence of defendant's General Agency — the annual allocations of renewal premium commissions are paid as a part of his commission income reported in Paragraph I [weekly income] above. Therefore, this sum is not an asset as such because it is a part of defendant's income annually." As such, in retirement, the annual renewal premiums paid on outstanding policies, when paid to the defendant are income. The inability of the defendant to generate new policies in his retirement, does not render to payments he does receive as something other than income. Monies do not have to be never-ending, as argued by the defendant, to be classified as income.
II. Other considerations
Even if this court were not to find the disputed payments income but were, instead, to treat them as an asset as argued by defendant, the court CT Page 1595 must still give consideration to these monies for purposes of this motion.
The court must also consider the deferred compensation benefits that a) were allocated between the parties at the time of the dissolution, and, b) those that accrued subsequent to the date of dissolution.
 "We reject the defendant's contention that to consider vested benefits for purposes of equitable distribution and also, as allocated, as a source of alimony constitutes impermissible "double dipping." Our alimony statute expressly provides that "[i]n determining whether alimony shall be awarded, and the duration and amount of the award, the court . . . shall consider . . . the award, if any, which the court may make pursuant to section 46b-81." General Statutes § 46b-82. Relying on the pension benefits allocated to the employee spouse under § 46b-81 as a source of alimony would be improper only to the extent that any portion of the pension assigned to the nonemployee spouse was counted in determining the employee spouse's resources for purposes for purposes of alimony. See Majauskas v. Majauskas, supra, 61 N.Y.2d 492
-93." Krafick v Krafick, 234 Conn. 783, 804-805, fn. 26, 663 A.2d 365 (1995).
At the time of the dissolution, the plaintiff received $500,000.00 of the $880,431.00 in the defendant's deferred compensation account in July, 1992. Since that date, the plaintiff's deferred compensation went into pay status as a result of the defendant's disability retirement. She entered into an agreement to receive level payment of $961.54 per month. The defendant, similarly, receives income from his deferred compensation account, as it is in pay status. As stated previously he receives level payments of $2,002.38 per month. His deferred compensation account is presently valued at $1,006,000.00. Our Supreme Court has held that, ". . . a substantial increase in wealth of any sort may form an appropriate ground for a motion to modify alimony." Bartlett v. Bartlett, 220 Conn. 372, 383,599 A.2d 14 (1991). In Bartlett, the alimony payee was seeking a modification upward as a result of her former husband's inheritance of substantial wealth. Conversely, here, the defendant seeks a downward modification although his overall wealth has increased from $1,722,114.00 in July, 1992 to $3,413,635.00 at the present time. Under the logic of Bartlett, then, this doubling of wealth, may form an appropriate factor for the court to consider adverse to the defendant's request for a downward modification. This reasoning, however, is tempered by the Appellate Court's later determination in Simms v. Simms, 25 Conn. App. 231593 A.2d 161, cert. denied, 220 Conn. 911, 597 A.2d 335 (1991).
Mr. Parri's net weekly income in July, 1992 was, $3,726.18. Now, it is $3,695.16. This is before consideration of his deferred compensation. CT Page 1596 The defendant, seeking a modification of the unallocated support and alimony order, has claimed that there has been a substantial change of circumstances by way of a substantial decrease in his income. The court finds that there has not been a substantial change of circumstances of the parties. The Motion for Modification is denied.
III. Re plaintiff's claim for attorney's fees
The plaintiff seeks attorney's fees for defense of the Motion for Modification. The court was carefully considered of statute and case law. The court notes the plaintiff has a portfolio of $843,000.00; the defendant has a portfolio of $906,000.00. Each party has significant deferred compensation assets, some in pay status. The attorneys' fees and costs charged to the plaintiff of $24,777.73 reflects a commitment of 105.50 hours of attorney time. The matter has had its share of complexities. The fees charged are reasonable and consistent with the locality for a matter of this nature.
Where each of the parties has ample liquid funds, the court cannot order counsel fees unless it finds the failure to do so will undermine the court orders. McGuire v. McGuire, 222 Conn. 32, 44 (1992). No such finding can be made here. The motion for counsel fees is denied.
Munro, J.