[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION RE: PLAINTIFF'S MOTION FOR CONTEMPTAND DEFENDANT'S MOTION FOR MODIFICATION
The parties' twenty-eight year marriage was dissolved by the court (Kaplan, J.) on April 2, 1992. The motions before the court derive from the parties' efforts to enforce or modify the judgment, which required the defendant to make regular alimony and installment payments to the plaintiff to effectuate property distribution orders.
This memorandum of decision addresses the plaintiff's Motion for Contempt dated January 16, 1996. (# 128) Therein, the plaintiff claimed that the defendant had failed to comply with the terms of the judgment, specifically asserting that he had accumulated a $2100 alimony arrearage. The plaintiff also claimed entitlement to attorney's fees for prosecution of the contempt motion. The file reflects that the defendant received in hand service of this motion on January 19, 1996. The issue of payment on this alimony arrearage was resolved by agreement of CT Page 10901 the parties, leaving the court to determine the issues of contempt and the plaintiff's claim for counsel fees. On January 9, 1997 the plaintiff submitted an Amended Arrearage claim, asserting that the defendant had failed to pay total alimony of $6,625 as of January 4, 1997.
This memorandum of decision also addresses the Motion for Modification dated March 15, 1996, through which the defendant asserted that the plaintiff's financial condition had improved since the time of Judge Kaplan's decree, and that his own position had substantially worsened. As a result, he claimed that the court should open and modify the judgment by entering reduced support orders. (# 129K)
After full evidentiary hearing and review of documents from the Probate Court for the District of Hartford, the court hereby grants the plaintiff's motion for contempt, and issues remedial orders consistent with its finding that the defendant is in contempt. The court denies the defendant's motion for modification, and sets forth the basis of its findings below.
The history of this matter is most relevant to the issues brought before the court. The transcript of Judge Kaplan's April 2, 1992 decision was reviewed for the purpose of ascertaining the basis, nature and extent of the financial findings and orders that were recorded at the time of judgment. The transcript reveals that at trial, the defendant was determined to have the capacity to earn gross weekly income of $1,200, or $62,400 per year. Tr. 4/2/97, p. 5. Although the transcript does not reveal any specific finding concerning the exact type of work the defendant had the capacity to perform, a thorough reading of Judge Kaplan's decision indicates his intention that the defendant would remain employed in the retail hairdressing and beauty service business. Tr. 4/2/92, p. 3-4.[1] Similarly, while he did not establish the express nature of the work he found the plaintiff capable of performing, Judge Kaplan acknowledged her skill and experience in the management and bookkeeping services associated with retail shops. Tr. pa 4/2/92, p. 2. Judge Kaplan further commented that he did not expect the plaintiff to continue to operate, or to earn income from, the retail establishment then jointly operated by the parties, known as the "Carriage House." Tr. 4/2/97, p. 5. Noting Judge Kaplan's reliance on the plaintiff's testimony insofar as evidence of earning capacity was concerned,[2] the court concludes that he had credited and relied upon the information set forth on her the CT Page 10902 plaintiff's financial affidavit dated March 31, 1992. This affidavit established that the plaintiff had an "assumed"[3]
gross weekly earning capacity of $400 per week or $20,400 per year, through employment in "sales." The plaintiff was thus determined to be capable of earning approximately one-third as much as the defendant.[4]
Accordingly, at the time of judgment Judge Kaplan ordered the defendant to pay the plaintiff weekly alimony of $300, and to participate in a series of property transfers for the benefit of the plaintiff. These transfers were subject to the execution of promissory notes or mortgages by the defendant on properties he would continue to hold in Old Saybrook, Poquonock St. in Windsor, and in Manchester. The defendant was further ordered to pay the plaintiff $120,000 as distribution of property, through periodic installment and balloon payments, all for purpose of effectuating the court's assignment of marital property. Judgment of April 2, 1992, p. 7. Judge Kaplan's orders clearly establish that these installment and balloon payments were to be accorded the status of property division, not periodic alimony.[5]
The transcript also reveals that at the time of judgment, the court was aware of certain assets held by the defendant jointly with his mother, Angela Bovino. Judge Kaplan did not distribute or assign these funds when rendering his decision, because at the time it was "not [the defendant's] money free to do with as he pleases." Tr. 4/2/97, p. 6.
 I
After considering the evidence presented at trial of the above motions, the court finds the following facts, which serve as the basis for the orders set forth below:
In 1993 and 1994, the defendant had met his alimony obligations in full by paying the plaintiff $300 per week. In 1995, he paid the plaintiff the full amount of alimony owed through the third week of November, for a total payment that year of $14,400 in alimony out of $15,600 due. Thereafter, commencing on December 2, 1995, the defendant ceased paying alimony at the ordered rate. At the end of 1995, he had accumulated an arrearage of $1200, or four weeks of payments, due to the plaintiff. On February 20, 1996, he paid the plaintiff $600 as alimony. Thereafter, in early March 1996, the defendant paid the plaintiff total of $375 as alimony. At the commencement CT Page 10903 of these proceedings, the defendant had paid the plaintiff a total of $4,275 as alimony for the calendar year 1996. As the defendant persisted in delaying alimony payments, the plaintiff claimed that at the conclusion of the first week of 1997, the net amount of alimony thus due from the defendant to the plaintiff was $6,625.[6] The plaintiff asserted that the defendant continued to accumulate an alimony arrearage, although partial alimony payments were tendered from time to time. There was no reliable evidence presented from which the court could conclude that the defendant had continued to make timely and consistent alimony payments to the plaintiff, in accordance with Judge Kaplan's orders, during the period of time which extended from the conclusion of the formal evidence phase of this case, through the submission by counsel of relevant documents relating to the Estate of Angela Bovino some months thereafter.
On March 31, 1995, the defendant had completed the refinancing of his Old Saybrook property. At that time, he executed a note obligating him to pay the plaintiff $120,000, as was required by the judgment. As of October 31, 1996, the defendant owed the plaintiff a total of $53,901.88 in principal and interest as the result of this note and the amortization schedule agreed to at the execution of the note. The defendant his demonstrated reasonable compliance with the orders requiring him to make installment and balloon payments on this note, and against the debt.
The defendant has continued to maintain his hair salon, Elegante Hair Designs, but works there as a hairdresser only on limited occasions: part-time, on Monday, Thursday and Friday of each week. For this effort, he claimed to earn approximately $200 per week. The salon itself is open five days a week. The defendant also claimed to receive approximately $150 per month, or $35 per week from a manicurist who uses his salon facilities to operate her own business, and to receive approximately $50 per week from a barber who also uses the Elegante salon. The defendant thus claimed current total professional income of $285 per week an amount that is far below his earning capacity as found by Judge Kaplan.
The defendant's friend and companion, Pam Kosker, also works at the salon: she pays the defendant nothing for her use of the facilities, but operates as his business manager in consideration for this privilege. The defendant lives at Kosker's home in Windsor, without providing her monetary compensation. The CT Page 10904 defendant is the father of Kosker's two children.[7] While continue to claim that he and Kosker share no other relationship than that created by their mutual children, the defendant's testimony evinced a persisting degree of intimacy between them.[8]
The defendant voluntarily spends most of his working hours at a restaurant and bar known as T.J.'s Cafe, located in Windsor. This business does not maintain a payroll, and the defendant claims that all employees and vendors are paid in cash. The defendant alleges that he works at T.J.'s seven days a week, although he asserts that he earns only $250 per week for his services. The defendant argues that he has no personal interest in T.J.'s Cafe, as the parties' adult son Todd is the legal permittee. In the spring of 1992, following Judge Kaplan's judgment and with knowledge of his court-ordered obligations to the plaintiff, the defendant and Todd jointly executed a ten-year lease permitting T.J.'s Cafe to continue to operate in its current location. The lease requires the defendant to pay approximately $2,400 per month for the use of the T.J.'s Cafe premises. Todd has now left the business, while the defendant remains working at T.J.'s for the ostensible purpose of honoring the lease. The checks used by the defendant to pay alimony to the plaintiff are drawn on the account of T.J.'s Cafe in Windsor, and are signed by the defendant. This indicates that some formal business records are kept by T.J.'s, beyond the "cash only" transactions identified by the defendant.
The defendant offered testimony in an effort to persuade the court that he currently receives total earned income of $535 per week less than one half the amount Judge Kaplan found him capable of earning in 1992. The defendant's financial affidavit, submitted at trial, asserts that he presently earns $710 per week, and was thus inconsistent with his own trial testimony. There was no evidence from which the court could find that any physical or mental health disability caused the reduction in the defendant's professional income from that demonstrated to Judge Kaplan. The defendant attributes his drop in income to the increased attention feels obligated to pay to T.J.'s Cafe, and to his perception that there is decreased demand for hairdressing and beauty services in the greater Hartford area.
The defendant has chosen to obtain minimal income from the rental of his unoccupied home at 3 Bel Air Manor in Old Saybrook. For the summer of 1997, he claimed to be limited to receipt of a CT Page 10905 total of $1,500 in rental income, resulting from three to four weeks of rental to friends, with some weeks allotted to their use without rental charge. The defendant has voluntarily elected not to rent the property to third parties, although he could do so to increase his weekly income, especially during the summer months. He does not occupy this property year round, as indicated above, but prefers to reside with Kosker and leave the Old Saybrook property generally vacant, the subject of mortgage and tax obligations, but with unperfected income potential.
At trial, several other areas of inquiry established the defendant's lack of veracity and his commitment to minimizing his income stream. The evidence established that in early 1995, the defendant had solicited refinancing for his Old Saybrook property. In connection with this loan application, he executed and submitted a sworn financial affidavit attesting to total gross monthly income of $4,166. At trial, the defendant claimed this information was but hyperbolic overstatement of his actual income, and admitted that he had supplied the bank with false data in an effort to obtain the loan.[9] Also at trial, the defendant admitted owning a lot in West Palm Beach, Florida, valued at approximately $12,000. The defendant's sworn financial affidavit, submitted to the court on November 20, 1996, makes no reference to this property. While the defendant attributes his failure to identify this asset to "oversight," the court finds this position disingenuous in light of the fabrication associated with his other financial statements.
The defendant did not timely file income tax returns for 1993, 1994 or 1995, so that such documents were unavailable for the court's review.
Since the time of judgment, each party has incurred personal debts and has become obligated to lending institutions in favor of real estate mortgages. Insofar as the defendant's refinancing of the Old Saybrook property is concerned, the court finds that this action was contemplated at the time of the decree, for purposes of meeting the installment and balloon payments ordered by way of property distribution. With regard to the plaintiff's refinancing of the marital home and the parties' mutual acquisition of substantial credit card debt, the court was presented with insufficient evidence from which it could conclude that these obligations resulted from anything other than voluntary expenditures made to meet her personal desires. Each party maintained the capacity to earn income above and beyond CT Page 10906 that demonstrated to be his or her actual income at the time of trial: the court finds that each party knowingly and voluntarily chose to work at less than capacity in the post-judgment period.
The defendant's mother, Angela Bovino, died in September of 1996, during the course of trial. The defendant is the sole heir to her estate. He claimed to owe $26,000 to his mother and/or to her estate, and that he had made premature withdrawals from accounts he held jointly with his mother. These claims were proferred as evidence of the de minimus value of the Estate of Angela Bovino. On June 2, 1997, the Hartford Probate Court approved the Final Accounting of the Estate of Angela Bovino, indicating that a net total of $72,000 was available for distribution to the defendant as the sole heir.[10] This entire amount derives from an interest in residential real estate located in the City of Hartford. This asset is newly credited to the defendant's estate, and is to be considered his sole property, as it has remained unencumbered pending the resolution of the pending motions. However, while this property is of significant worth, its conversion to cash after sale would likely require a discounted assessment of its value from that acknowledged by the Probate Court, to accommodate realtor's fees and closing costs. All liquid assets from the Estate of Angela Bovino were expended for the payment of health care bills and final expenses, as approved by the Probate Court.
The plaintiff continues to occupy the marital homestead in Wethersfield. She lives there with her adult son and his wife. While they are each employed, these "boarders" do not pay rent to the plaintiff, but merely contribute $35 per month for payment of the cable TV bill. There was no reliable evidence from which the court could ascertain the value of their rent-free occupancy, but it is clear that the plaintiff has failed to maximize her ability to accrue income by requiring a reasonable rental rate for the long-term use of her home.
In 1994, the plaintiff ceased operation of the Carriage House boutique, as she was unable to acquire sufficient profits to meet her expenses. Thereafter, the plaintiff has remained employed on a part-time basis, most often in retail sales. She has recently worked at a bridal shop four days a week receiving $9 per hour, indicating that she is currently earning gross income of approximately $270 per week. Like the defendant, the plaintiff offered no evidence from which the court could conclude that any physical or mental health disability caused the plaintiff's CT Page 10907 actual income to be so significantly reduced from the $400 weekly gross earning capacity assigned by Judge Kaplan at the time of judgment.
In addition to her earned income, the plaintiff receives $900 per month from the defendant as installment payments required by Judge Kaplan's property distribution orders. The plaintiff does not show these payments as "income" on her financial affidavits, but does set forth the amount of interest payments she regularly receives from the defendant as he honors the promissory notes. In addition, on March 31, 1995, the defendant made a balloon payment to the plaintiff in the amount of $49,500 as a part of their property settlement. The plaintiff deposited these funds to an account which was used in the Spring of 1996 to secure a $100,000 home equity loan against the Wethersfield property. She has used the majority of the monies available from this loan to assist in maintaining her lifestyle while awaiting alimony payments and while working part-time, although portions have been used for repairs and improvements to her home.
The parties stipulated that plaintiff's counsel charged her a fair and reasonable rate of $150 per hour for his services. Plaintiff's counsel expended no less than 41.8 hours in prosecution of the contempt proceedings, so that the plaintiff incurred no less than $6270 in attorney's fees in connection with this aspect of the case.[11] The file reflects that service of the plaintiff's motion for contempt required payment of sheriff's fees in the amount of $36.60. The parties stipulated that the defendant's counsel charged him a fair and reasonable rate of $195 per hour for his services.
 II
The defendant claims that his drop in actual earnings is attributable to circumstances beyond his control, not of his own making, and that he is therefore entitled to a downward modification of Judge Kaplan's alimony orders. He asserts that he has not avoided earning income through full-time work as a hairdresser or as the operator of a beauty salon, but that his poorly-compensated efforts at T.J.'s Cafe serve in lieu of that type of employment. He claims that as his actual earnings have decreased, he cannot be found in contempt of Judge Kaplan's orders to pay periodic alimony. He further claims that the plaintiff has failed to maximize her capacity to earn income, and that she should not be allowed to benefit from orders that were CT Page 10908 entered when she had full time employment and higher actual income.
The plaintiff counters that the defendant has failed to make reasonable and honest efforts to work as a hairdresser, which would enable him to earn sufficient income to honor Judge Kaplan's orders. Instead, she submits that the defendant has minimized his professional income stream, preferring to work at T.J.'s cafe and collecting unregulated cash income, all to her detriment. She claims that the defendant has had the capacity to comply with Judge Kaplan's alimony orders, through gainful employment, and effective management of his rental properties, but that he has willfully failed to do so. The court finds these issues in favor of the plaintiff.
In considering the evidence presented in support of the pending motions, and in reaching its decision in this matter, the court has observed and applied the requisite statutory criteria, common law, tax and equitable principles. Section 46b-86 (a) of the General Statutes provides the court with jurisdiction to modify any final order of alimony or support "upon a showing of a substantial change in the circumstances of either party." Alimony orders are amenable to such modifications "[u]nless and to the extent that the decree precludes modification." Id. As the Judge Kaplan's judgment presents no prohibition against modification, the general principles of § 46b-86 (a) apply to the instant case with regard to review of alimony orders. Where a party seeks modification of support orders based upon a substantial change in circumstances, that party bears the burden of proving the existence of that substantial change. Emerick v. Emerick,28 Conn. App. 794, 802 (1992).
Section 46b-82 of the General Statutes establishes the parameters for orders requiring payment of alimony. In entering such orders, the statute requires the court to consider, inter alia, "the age, health, station, occupation, amount and sources of income, vocational skills, employability, estate and needs of each of the parties . . . ." Id. In addition to considering the parties' actual earnings in the course of an alimony review, the court is also required to evaluate the earning capacity of each party. In the context of family matters, "[e]arning capacity . . . is not an amount which a person can theoretically earn, nor is it confined to actual income, but rather it is an amount which a person can realistically be expected to earn considering such things as his vocational skills, employability, CT Page 10909 age and health." Lucy v. Lucy, 183 Conn. 230, 234 (1981). See also Schmidt v. Schmidt, 180 Conn. 184, 189-90 (1980); Carey v.Carey, 29 Conn. App. 436, 440 (1992). Thus, in appropriate circumstances in family matters, "a trial court may base its financial awards on the earning capacity rather than the actual earned income of the parties. . . Such circumstances include those where there is evidence that a party voluntarily quit or avoided employment in his or her field of expertise and where there is evidence of that party's previous earnings." (Internal citations omitted; citations omitted.) Paddock v. Paddock,22 Conn. App. 367, 371 (1990). See also, Lucy v. Lucy, supra,183 Conn. 234. The court may base such financial orders on a determination of earning capacity, rather than actual earnings, even if there is no showing that avoidance of gainful employment was wilfully accomplished for the purpose of reducing an obligation to pay support. See Wilkens v. Wilkens,10 Conn. App. 576, 580 (1987). Any award of support which is based on a party's capacity to earn income "requires that party to continue to work or find other sources of income to meet the obligations of the court's order." See Lawler v. Lawler, 16 Conn. App. 193,204 (1988).
It is axiomatic and fundamental that the trial court is without power to modify any orders for distribution or assignment of property assignments made pursuant to § 46b-81. Grayson v.Grayson, 4 Conn. App. 275, appeal dismissed 202 Conn. 221 (1985);Bunche v. Bunche, 180 Conn. 285 (1980). Where a party is found to be in arrears with regard to unpaid support obligations, the court may consider the financial circumstances of the obligor when determining the ability to pay an arrearage, and the manner in which the arrearage may be paid. Moore v. Moore,187 Conn. 589, 590 (1992). Where appropriate, our courts have approved orders for lump sum payments on alimony arrearages. LaBow v.LaBow, 13 Conn. App. 330, 350, 352 cert. denied 207 Conn. 806
(1988); Friedly v. Friedly, 174 Conn. 279, 281 (1978). While evidence of the liquidity of a party's assets may be relevant to the subject of ability to pay an arrearage, the court must consider an offending party's capacity to earn income, as well, when fashioning remedial orders. See Mallory v. Mallory,207 Conn. 48, 55-56 (1988).
Pursuant to § 46b-87 of the General Statutes, "[w]hen any person is found in contempt of an order of the Superior Court . . . the court may award to the petitioner a reasonable attorney's fee and the fees of the officer serving the contempt CT Page 10910 citation, such sums to be paid by the person found in contempt." In determining whether such fees should be assigned to the contemnor, the court may consider the factors set forth in §46b-81 and § 46b-82, including "the age, health, station, occupation, amount and sources of income, vocational skills, employability, estate and needs of the parties . . . ." See generally, Dobozy v. Dobozy, 241 Conn. 490, 500 (1997).[12]
 III
In this case, the defendant has failed to fulfill his burden of proving that a substantial change in circumstances has affected his ability to honor the alimony orders issued by Judge Kaplan at the time of judgment. Accordingly, he is not entitled to a downward adjustment of the amount of weekly alimony he must pay to the plaintiff, as sought through his motion for modification. Emerick v. Emerick supra, 28 Conn. App. 802. The evidence clearly establishes that the plaintiff has elected not to work at the level of capacity attributed to him by Judge Kaplan. The defendant does not work full time in his licensed profession as a hairdresser, either in a self-employed status, or as a full-time employee at a salon owned by another individual: there is no reliable evidence from which the court could conclude that the defendant has made reasonable but unsuccessful efforts to obtain such full-time employment. Rather, the defendant has established a pattern of working far below his earning capacity, spending the majority of his days and nights at T.J.'s cafe, without any demonstrated opportunity for earning a responsible amount of income from this endeavor. Clear and convincing evidence indicates that the defendant has more recently chosen to ignore Judge Kaplan's the order for alimony payments, when he had the ability, although not the inclination, to pursue work which would enable him to honor this order.
The defendant in this case appears to rely on "some veiled claim" that actual earnings represents a "cap" on support orders that may be issued by the court. Compare Graham v. Graham,25 Conn. App. 41, 46 (1991). However, in this case, there was no reliable evidence presented from which the court could conclude that the defendant's capacity to earn income has been altered in any way since 1992: clear and convincing evidence instead supports the finding that the defendant's earning capacity has remained constant, although he has chosen not to work or find other sources of income to meet the obligations of Judge Kaplan's order. Lawler v. Lawler, supra, 16 Conn. App. 204. As indicated, CT Page 10911 the court found that the defendant's testimony concerning his inability to pay alimony as previously ordered, like his financial affidavits, lacked credibility and consistency. Thus, at this time, the court finds that the defendant's capacity to earn income provides a more reliable measure of his ability to pay spousal support than does his actual income. Lucy v. Lucy,
supra, 183 Conn. 234; Schmidt v. Schmidt, supra,180 Conn. 189-90; Wilkens v. Wilkens, supra, 10 Conn. App. 580.
The court credits the plaintiff's testimony and financial affidavit which establish that her actual income has somewhat decreased from that demonstrated at the time of Judge Kaplan's rulings. However, the plaintiff has not sought an increase in the alimony award, despite the fact that her reduced income may possibly have created an enhanced need for spousal support. As she has not requested an upward modification of the alimony order, despite her failure to acquire income from her "boarders" or to obtain and pursue full-time employment or its equivalent through multiple part-time jobs, the court finds no substantial change in her financial circumstances warranting readjustment of the alimony award.
The only manifest changes in the parties' financial conditions, as set forth through the evidence in this case, are attributed to their mutual debt increases, and to the defendant's inheritance from the Estate of Angela Bovino. The court has previously found that the parties voluntarily incurred their debts, or did so pursuant to Judge Kaplan's orders, so that no substantial change in circumstances should be found within the meaning of § 46b-86: the parties should not be entitled to establish increased support needs, or diminished ability to provide support, based upon unnecessarily assumed debt obligations. Wilkens v. Wilkens, supra, 10 Conn. App. 580.
On the other hand, clear and convincing evidence supports the finding that the defendant now is in control of a tangible asset that was inchoate at the time of Judge Kaplan's orders: the real estate valued at $72,000 that he has inherited from his mother's estate. Such an asset forms a proper basis for the court's determination that he now has an enhanced ability to honor Judge Kaplan's original alimony orders, and to make reasonable payments to the plaintiff to reduce any amounts of past-due alimony that have accrued. See Moore v. Moore, supra, 187 Conn. 590; Friedlyv. Friedly, supra, 174 Conn. 281; LaBow v. LaBow, supra,13 Conn. App. 350. CT Page 10912
The clear and convincing evidence presented at trial establishes that the defendant voluntarily and intentionally has failed to heed the principle that "[a]n order of the court must be obeyed until it has been modified or successfully challenged."Bunche v. Bunche, supra, 36 Conn. App. 325. Instead, he pursued a pattern of inconsistent and infrequent alimony payments to the plaintiff, when he could and should have made regular and consistent payments according to the schedule assigned at the time of judgment. This pattern commenced in November of 1995, and persisted at least through mid-March of 1997. As a result of the defendant's pattern and practice of avoiding the court's alimony orders, he has accrued an arrearage to the plaintiff for past alimony due. As indicated, the parties essentially agreed that as of the first week of January, 1997, the defendant was $6,625 in arrears. From that date to the present, some forty-two weeks have expired, during which time the plaintiff was owed $300 as alimony each week. The total alimony arrearage is thus found to be $19,225 as of the date of this decision.[13]
Under these circumstances, the court finds that the defendant willfully failed to comply with Judge Kaplan's order to pay the plaintiff weekly alimony of $300 when he had the capacity to honor his past alimony obligations. The court finds the defendant in contempt for failure to so comply with the court's existing support order.
 IV ORDERS
WHEREFORE, the court hereby grants the plaintiff's Motion for Contempt dated January 16, 1996; denies the defendant's Motion for Modification dated March 15, 1996; and enters the following remedial orders:
Current periodic alimony: The defendant is ordered to continue paying current periodic alimony to the plaintiff in the amount of $300 per week. Payments are to made by first class United States Postal Service delivery, by check or money order made payable to the plaintiff in the full weekly amount, deposited in the mail on Saturday of each week representing alimony due for the following week. The plaintiff is ordered to timely negotiate the defendant's tendered payments, and the defendant is ordered to retain all cancelled checks or money orders representing such CT Page 10913 payments.
Alimony arrearage: The defendant has been found to have accumulated an alimony arrearage of $19,225. The defendant is to be credited against this total alimony arrearage for any amounts he has paid to the plaintiff in compliance with Judge Kaplan's order, but which have not been the subject of this court's attention. The defendant has been found to have assets sufficient to pay this arrearage in full, as the result of his access to assets distributed through his mother's estate. The court recognizes that while those assets are not now in liquid form, they are reasonably amenable to liquidity.
Accordingly, the court orders the defendant to make payments to the plaintiff against this alimony arrearage as follows: $4,000 to be received by the plaintiff no later than January 15, 1998; $4,000 to be received by the plaintiff no later than April 15, 1998; $4,000 to be received by the plaintiff no later than July 15, 1998; $4,000 to be received by the plaintiff no later than October 15, 1998; and $3,225 to be received by the plaintiff no later than January 15, 1999. These payments are to made by certified or registered United States Postal Service delivery, by check or money order made payable to the plaintiff for the installment amount due, with mail deposit made no later than seven days prior to the date when payments are due in the plaintiff's hand. The plaintiff shall be entitled to simple annual statutory interest on any unpaid portion of each payment the current periodic alimony to which she is due in accordance with this order. She shall be entitled to reasonable attorney's fees for services required to collect any unpaid portion of the current installment payment of alimony arrearage to which she is due in accordance with this order. The plaintiff is ordered to timely negotiate the defendant's tendered payments, and the defendant is ordered to retain all cancelled checks or money orders representing such payments.
These payments represent fulfillment of a past-due alimony obligation, and shall not be dischargeable in bankruptcy, nor considered to be a transfer of property from the defendant to the plaintiff in accordance with § 46b-81 of the General Statutes.
Counsel fees: The defendant, having been found to be in contempt of Judge Kaplan's orders, is ordered to pay the plaintiff $4000 for attorney's fees pursuant to § 46b-87, plus $36.60 as CT Page 10914 costs for the sheriff's service. Of this amount, $1000 shall be received by the plaintiff no later than December 15, 1997; $1000 shall be received by the plaintiff no later than March 15, 1998; $1000 shall be received by the plaintiff no later than March 15, 1998; and $1036.60 shall be received by the plaintiff no later than June 15, 1998. Payments are to made by first class United States Postal Service delivery, by check or money order made payable to the plaintiff in the installment amount, deposited in the mail no later than seven days prior to the date when the payments are due to be received by the plaintiff. The plaintiff shall be entitled to simple annual statutory interest on any unpaid portion of the counsel fees to which she is due in accordance with this order. She shall be entitled to reasonable attorney's fees for services required to collect any unpaid portion of the counsel fees to which she is due in accordance with this order. The plaintiff is ordered to timely negotiate the defendant's tendered payments, and the defendant is ordered to retain all cancelled checks or money orders representing such payments.
All other orders: All other orders issued by Judge Kaplan on April 2, 1992 for installment and balloon payments, and otherwise a part of the judgment file, are to remain in full force and effect, unmodified by any action of this court except as follows: all property settlement payments ordered by Judge Kaplan are to be paid by the defendant to the plaintiff through deposit in first class United States Postal Service delivery, by check or money order made payable to the plaintiff in the installment amount, with deposit to be made no later than seven days prior to the date when the payment is due to be received by the plaintiff. The plaintiff is ordered to timely negotiate the defendant's tendered payments, and the defendant is ordered to retain all cancelled checks or money orders representing such payments.
BY THE COURT,
N. Rubinow, J.